270 F.2d 823
 Robert K. MAYO, H. E. Harper and Jack C. Murrell, as Trustees in Bankruptcy of Twin City Construction Company, Inc., Bankruptcy, Appellants,
v.
PIONEER BANK & TRUST COMPANY, Appellee.
 No. 17540.
 United States Court of Appeals Fifth Circuit.
 September 30, 1959.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Cleve Burton, Richard H. Switzer, W. V. Lunn, John A. Carstarphen, Jr., Shreveport, La. (Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, La., of counsel), for appellants.
 Paul M. Hebert, Baton Rouge, La., Turner B. Morgan, Shreveport, La. (Morgan, Baker, Skeels, Middleton & Coleman, Shreveport, La., Breazeale, Sachse, Wilson & Hebert, Baton Rouge, La., of counsel), for appellee.
 Before JONES, BROWN and WISDOM, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 The Trustees in Bankruptcy of Twin City Construction Company, a Louisiana corporation, sued The Pioneer Bank and Trust Company of Shreveport, Louisiana, to recover $69,145. The Trustees contend that, under Sections 60, sub. b and 67, sub. d of the Bankruptcy Act, 11 U.S.C.A. §§ 96, sub. b, 107, sub. d, the bankrupt corporation made certain voidable transfers to the bank. Three separate claims are involved: (1) one for $50,125; (2) one for $9,000; and (3) one for $10,200. The case was tried to the court without a jury. The district judge rejected all three claims of the Trustees. We affirm as to the first two claims, reverse and remand as to the third claim.
 
 I. Background
 
 2
 For many years William A. Gray of Shreveport engaged in the construction business under the name of W. A. Gray Construction Company. To all appearances he was a successful contractor. For several years, however, before he died in 1956, he was in bad financial straits. With considerable skill he managed to conceal his financial plight until January, 1956.
 
 
 3
 Pertinent to this action is the fact that Gray was the president and sole stockholder of Twin City Construction Company, a corporation Gray organized in 1951. Twin City conducted no business prior to the transactions in question in this case.
 
 
 4
 Gray had an established line of credit at the Pioneer Bank. When the bank was organized in 1945, Gray was one of its first depositors and customers. Over a long course of dealings, the bank made many loans to Gray to finance his construction business and to permit him to start and carry forward individual construction contracts. Pioneer Bank had never sustained a loss on any loans to Gray. Rupert Campbell, President of the Pioneer Bank, handled Gray's account himself. The district judge found: "It is apparent that those who did business with Gray had utmost confidence in his ability to meet his financial obligations." [168 F.Supp. 505.]
 
 
 5
 March 12, 1956 an involuntary petition in bankruptcy was filed against Gray. Two weeks later, on his voluntary petition, he was adjudicated a bankrupt. April 13, 1956 an involuntary petition in bankruptcy was filed against Twin City Construction Company by the Home Indemnity Company. April 21, 1956, Twin City voluntarily was adjudicated a bankrupt.
 
 
 6
 At the time of the trial, Twin City owed $71,045.32 in unsecured claims and $4,531.38 in taxes; the company had assets of $91.14. Gray owed $794,277.99 in unsecured claims and $5,435.82 in taxes; he had assets of $8,771.23.
 
 II. The Claim for $50,125
 
 7
 On May 28, 1955, Gray talked with Campbell about obtaining a loan of $50,000. He told Campbell that he wanted to give up doing business individually and do business in corporate form by activating Twin City Construction Company and channeling his construction contracts into that corporation. He stated that his health had been poor and that by using Twin City he could insure continuity and avoid personal liability. Gray said that he had arranged to obtain needed capital from a cousin who was going into business with him.
 
 
 8
 The Pioneer Bank made the loan of $50,000, taking Gray's personal note, payable in fifteen days. At Gray's direction, the money was deposited in Twin City's checking account. Shortly thereafter, Gray issued to himself stock of Twin City amounting to $49,500. At the time of the loan the bank held collateral mortgages amounting to $40,000 on Gray's office building and equipment, a $40,000 mortgage on his home, and a pledge of all the stock of the Blair Apartments which Gray owned. Gray gave the bank copies of corporate resolutions authorizing him "to enter into any and all contracts whatsoever for Twin City and to do any and all acts whatsoever on such terms and conditions and for such considerations, within his discretion", the intention being "to authorize W. A. Gray as President to represent this corporation in all matters whatsoever and to confer on him the fullest possible powers of representation". The resolutions also authorized the Pioneer Bank "to honor, receive, certify or pay all instruments [signed by Gray] * * * even though drawn or endorsed to [Gray] * * * or in payment of the individual obligation of such officer, or for deposit to his personal account, and said Bank shall not be required, or be under any obligation to inquire as to the circumstances of the issuance, or use of any [such] instrument * * *."
 
 
 9
 Twelve days later, June 9, 1956, Gray informed the Pioneer Bank that his plans had fallen through, that "the fellow who was going to put the money in with him wouldn't go", and that there was no necessity for the loan. The transaction was then closed out by payment to the bank of principal and interest, $50,125, in the form of a check drawn by Gray as president of Twin City. None of the $50,000 credit traceable to the loan had been withdrawn from Twin City's account. Thus, except for bookkeeping purposes to reflect a loan to Gray and deposit to the account of Twin City, the $50,000 did not leave the possession of the bank. Payment of the loan simply required a reversal of bookkeeping entries and in effect the identical $50,000 originally credited to Twin City was returned to the bank.
 
 
 10
 In the interval between the loan and its repayment, Twin City had a certified audit prepared showing a credit balance of $50,000 in the Pioneer Bank. This audit report and a financial statement were used by Gray in obtaining for Twin City a contractor's performance bond from the Home Indemnity Company. Before issuing a bond, but after the $50,000 loan had been repaid, Home Indemnity Company conducted an investigation of Twin City's application for a bond. Home Indemnity's investigator obtained a routine verification from the bank that as of May 31, 1955 Twin City had a balance of $50,000 in the Pioneer Bank. The bonding company made no attempt to inquire as to whether the $50,000 or any part of it was on deposit after May 31, 1955. On completion of its investigation and after it had satisfied itself with the personal guaranty of W. A. Gray, Home Indemnity wrote the bond June 21, 1956.
 
 
 11
 Twin City had only one construction contract, a government contract at Blytheville, Arkansas. Eventually the company defaulted and Home Indemnity, as the insurer, paid bills of $52,130.42 to complete the contract.
 
 
 12
 The district judge found that the Pioneer Bank had no knowledge of the issuance of Twin City stock to Gray and no knowledge of Gray's intention to have the stock issued to himself in return for the proceeds of the loan. The district judge found that the Bank's officers and employees were not parties to any misrepresentation of any character to the bonding company. The bank acted in good faith and was as much deceived by Gray as the bonding company was deceived. Just prior to the collapse of his operations in January of 1956, Gray had nine large government construction contracts in Arkansas. The district judge stated: "[T]he apparently substantial character of Gray's business and account with the Bank * * * justified the course of dealing and confidence the Bank's President had in him." The record amply supports the findings of the district court.
 
 
 13
 The Trustees argue that the Twin City payment of $50,125 was a voidable transfer for three reasons. (A) Twin City's payment of Gray's personal debt to the Bank was a transfer "without fair consideration" under the constructive fraud provisions of Section 67, sub. d(2) (b), 11 U.S.C.A. § 107, sub. d(2) (b). (B) The transfer was part of a scheme to hinder, delay, or defraud creditors within the meaning of Section 67, sub. d(2) (d), 11 U.S.C.A. § 107, sub. d(2) (d). (C) The payment is voidable pursuant to Section 70, sub. e of the Bankruptcy Act, under the Uniform Fiduciaries Act as adopted in Louisiana, LSA-R.S. 9:- 3801-3814, particularly LSA-R.S. 9:- 3808.
 
 
 14
 A. Payment to the bank was not a transfer by Twin City without "fair consideration" under the constructive fraud provisions of the Bankruptcy Act. 11 U.S.C.A. § 107, sub. d(2) (b).[1]
 
 
 15
 The Trustees argue that on completion of the loan to Gray, the $50,000 was Gray's to use as he pleased. When he chose to spend it by buying stock in Twin City, the money then belonged to Twin City. Twin City was a third party transferee, as to the bank. According to the Trustees' argument, when Twin City, the bankrupt, under no obligation to the bank, paid Gray's loan, it was the payment of a debt of another without "fair consideration", under the language of the Act, and therefore a voidable transfer.
 
 
 16
 There is no doubt that usually a diversion of corporate assets for the benefit of a third person, such as the payment of the loan of another, is a transfer without "fair consideration".[2] This however is not the usual case.
 
 
 17
 The trial court found that repayment to the bank of the identical bookkeeping credit reflecting the proceeds of a loan never withdrawn was supported by a fair equivalent in value. The district judge held that under the law of Louisiana, either on the principle of quasi-contract (unjust retention of a benefit)[3] or delictual responsibility,[4] the circumstances gave rise to an antecedent indebtedness of Twin City sufficient to satisfy the requirement of "fair consideration". The court found: "The circumstances of this case are unusual and the court, viewing the matter in its entirety, considers that this is, in fact and law, a situation in which the Court is called upon to exercise traditional equity powers of a Court of Bankruptcy." [168 F. Supp. 510.]
 
 
 18
 Whether fair consideration has been given for a transfer is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts".[5] We find that the record supports the findings of the trier of the facts in this case.
 
 
 19
 We are of the opinion that it is unnecessary to decide whether the facts meet the Louisiana requirements for a quasi-contract or a tort. We hold, as to the claim for $50,125, that the facts justify disregarding the fiction that Twin City was a separate legal entity. Gray and Twin City were one.
 
 
 20
 There was such a degree of identity and commingling of affairs between Twin City and Gray that the corporation and its sole stockholder cannot be regarded as separate legal entities, insofar as the $50,000 loan is concerned. Gray was the sole stockholder. The corporate resolutions authorized Gray to act for Twin City in whatever way he saw fit, and authorized the Bank to honor Twin City checks drawn by Gray to pay personal debts. The loan was made on Gray's credit, but the proceeds inured immediately to Twin City's credit and the ostensible purpose of the loan, as stated to the bank, was to enable Gray to do business as Twin City Construction Company instead of W. A. Gray Construction Company. The hidden purpose was to enable Gray to obtain a performance bond in the name of Twin City that Twin City was not entitled to on the state of its finances and that Gray could not obtain on the state of his finances. After this object was accomplished, and before Twin City could even begin a separate existence, Twin City, through Gray, paid back the identical money lent to Gray and deposited in the corporate account only twelve days before. From the beginning to the end of the transaction Gray as Gray, or Gray as Twin City, made no effort to separate himself from his corporation — so far as the bank is concerned. To the extent that Gray is separable from Twin City, the loan was for the benefit of Twin City; if the loan was for the benefit of Gray, the bank had no alternative, under the language of the resolutions, to honoring Gray's signature and instructions.
 
 
 21
 It is one thing to observe the corporate fiction as if the fiction were the truth — when the fiction is not abused. It is quite a different thing when the sole stockholder either ignores the corporation as a separate entity or uses the corporate fiction as an instrument of deceit. Here, the corporation and the individual owner were two sides of a single false coin.
 
 
 22
 Experienced counsel represent the parties to this appeal. They have not been able to find a case that this Court regards as similar on the facts to the instant case.[6]
 
 
 23
 Section 67, sub. d(1) (e) provides that consideration is "`fair' * * * when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied". Section 67, sub. d(1) defines debt broadly as "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent".
 
 
 24
 The requirement of "fair consideration" is aimed at preventing a bankrupt depleting his estate just preceding his bankruptcy either by improvidence or by action intended to defeat creditors or favor friends. As we read the statute in the light of its purpose, we think that the voidable transfer provisions were never intended to apply to this case. Here, Gray-Twin City, having accomplished the object of the loan in obtaining a performance bond, repaid the loan. There was no improvidence as in making a transfer with grossly unfair consideration, and no constructive or actual intention to defeat creditors or favor friends.
 
 
 25
 It seems to us that of the things Gray did, the thing that he did in paying the loan was a far, far better thing than the record shows he had ever done.
 
 
 26
 B. The transfer was not part of a scheme to hinder, delay, or defraud creditors within the meaning of Section 67, sub. d(2) (d), 11 U.S.C.A. § 107, sub. d(2) (d).[7] As distinguished from 107, sub. d(2) (b), subsection (d) requires a showing of "actual intent" to defraud creditors in order to set aside a transfer. Actual intent is a question of fact.[8] The district court held — and we agree — that there was no proof of actual intent to defraud creditors of Twin City. Gray's misrepresentations related to obtaining the bond. At the time the loan was repaid, Gray expected Twin City to be able to complete the Blytheville contract. He was confident that the venture would be a profitable one and that he would be able to rehabilitate himself financially. Although a transfer may have the effect of hindering or delaying or defrauding creditors, incidental effect is not enough to satisfy the requirement of actual intent to defraud. Coder v. Arts, 213 U.S. 223, 29 S.Ct. 436, 53 L.Ed. 772; In re Braus, 2 Cir., 1917, 248 F. 55. In any event, the Bank accepted the payment in good faith and is therefore a bona fide obligee within the protection of Section 67, sub. d(6).
 
 
 27
 C. The Trustees' argument for relief under the Uniform Fiduciaries Act, LSA-R.S. of 1950, 9:3801 et seq., must also fail. Section 3805[9] provides that a payee of a check or bill of exchange is liable to the drawer's principal for the proceeds if: (1) the payee had actual knowledge that the drawer-fiduciary committed a breach of trust, or (2) if, in drawing the instrument, the drawer has in fact committed a breach of trust unknown to the payee, but the payee did know that the drawer was paying a personal debt. Under Section 3808[10] a drawee-bank becomes liable to the principal when a fiduciary draws a check on the principal's account to pay a personal debt if in fact the fiduciary commits a breach of trust.
 
 
 28
 The important factor under the Act in holding a bank responsible for a fiduciary's breach of trust is whether or not the debt that was paid was for the personal use of the fiduciary. Thus, relief under the Act was allowed in LaVecchia v. North Carolina Joint Stock Land Bank, 1940, 218 N.C. 35, 9 S.E.2d 489, where the debtor drew a check as president of the company to buy land for his personal use. No part of the loan or its use inured to the company. Anacostia Bank v. United States Fidelity & Guaranty Co., 1941, 73 App.D.C. 388, 119 F.2d 455, involved a guardian-ward situation. The court implied that if the guardian had used the guardianship funds to pay a debt that in some way benefited the ward, instead of the guardian only, the drawee-bank would not be liable. But the loan was solely for the personal use of the guardian.
 
 
 29
 The loan to Gray, however, was not a loan to a corporate officer for his personal benefit such as the Act contemplates. To the knowledge of the bank, the loan was for the benefit of Twin City and deposited to Twin City's account. The conditions necessary for relief under the Act are not present here: the debt incurred was not the kind of personal debt contemplated by the Act; the Bank did not have actual knowledge of any breach of trust as to Twin City, if one was committed at all.[11]
 
 II. The $9,000 Claim
 
 30
 On December 28, 1955, within four months prior to the filing of the involuntary petition in bankruptcy against Twin City, the bank made a loan of $10,000 to Twin City. That same day Gray instructed the Bank to transfer $9,000 from Twin City's checking account to Gray's personal account. The transfer was accomplished by debit memorandum. Gray was acting as president of Twin City and pursuant to the extremely broad powers vested in him by the corporate resolution when he requested the transfer of funds.
 
 
 31
 The $9,000 inured to the benefit of W. A. Gray Construction Company in that it was used to cover disbursements made and charged to the checking account of W. A. Gray Construction Company. At the time of the transfer Gray's personal account was overdrawn in the amount of $4,398.69 which had occurred in the normal course of business of W. A. Gray Construction Company. Overdrafts occurred frequently in Gray's account. In 1955 overdrafts were almost a daily occurrence. It was normal practice to cover such overdrafts by deposits in the W. A. Gray Construction Company account.
 
 
 32
 The district court found that Pioneer Bank did not in fact receive the $9,000 deposited in the checking account of W. A. Gray Construction Company. The funds were credited to the checking account of the Construction Company and were utilized to balance the account, including the payment of overdrafts.
 
 
 33
 The Pioneer Bank was financing Twin City on one contract and Gray on nine contracts. When the bank received the transfer of $9,000 it had no reason to believe that either Twin City or Gray was insolvent. Certainly the bank would not have made a loan to Twin City on December 29, 1955, if it had any idea that Twin City was insolvent. The district court found that the Pioneer Bank acted in good faith in accepting the deposit of $9,000, in giving the credit, and by paying the items subsequently paid and covering the items included in the overdraft.
 
 
 34
 Under Section 9 of the Fiduciaries Act (LSA-R.S. 9:3809),[12] the bank is protected. This section reads:
 
 
 35
 "If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary or of checks * * * drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and endorsed by him, if he is empowered to endorse such checks, or if he otherwise makes a deposit of funds held by him as a fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit * * * amounts to bad faith."
 
 
 36
 The purpose of Section 3809 is to protect a depository bank that acts in good faith without any knowledge other than the fact that funds are being transferred by a fiduciary to his personal account or to persons with whom he is dealing. Such knowledge alone will not satisfy the requirement of actual bad faith or knowledge that the fiduciary committed a breach of trust.
 
 
 37
 The record is devoid of any evidence showing actual knowledge of a breach of fiduciary duty. And, the previous course of dealings between the parties, the identity of Gray with Twin City, and the broad powers authorizing Gray to act for Twin City (if the corporate fiction is entitled to weight in the circumstances of this case) support the view that the bank acted in good faith.
 
 
 38
 The trustees contend that they are at least entitled to recover the amount of the overdraft. They argue that receiving fiduciary funds in payment of a fiduciary's overdraft is not covered specifically by the Uniform Fiduciaries Act and that, under ordinary rules of liability which apply in situations not covered by the Act, the bank is liable. LSA-R.S. 9:3812.[13] The trustees point out that the Act has for its purpose the protection of commercial transactions in which credits and bills of exchange are involved, not a transfer of funds in payment of a personal debt by means of a debit memorandum or a deposit in a fiduciary account which has the mechanical effect of paying the debt. The trustees rely on Colby v. Riggs Nat. Bank, 1937, 67 App.D.C. 259, 92 F.2d 183. In that case a fiduciary who had overdrawn his personal account drew a check upon the fiduciary account payable to himself individually and deposited it in the bank to the credit of his personal account. The Court held that the Act did not protect the bank since the bank did not receive the check in payment of the depositor's personal indebtedness to it. Two of the five judges in Colby wrote dissenting opinions. We feel that the dissent expresses the better view.[14] The line between giving a check to a bank to pay a personal debt and depositing a check in an overdrawn account is too fine a line for us to discern. The effect of Colby would be "to make the application of the Act to the innocent transferee, whom it seeks to protect, depend upon the banking procedure employed by this defalcating trustee seems unnecessarily formalistic". Comment, 51 Harv.L.Rev. 563 (1937).
 
 III. The $10,020 Claim
 
 39
 Twin City borrowed $10,020 from the Bank on December 29, 1955. At the same time the bank took a pledge agreement in keeping with its usual practice in making loans to finance Gray's construction contracts. Twin City pledged the balance due on Blytheville contract it had with the federal government to secure the loan. No notice of the pledge was given to the government. Twelve days later the government made a payment of $11,693.18 to Twin City on the contract. The proceeds were deposited in Twin City's account. Twelve days after the loan was made, Twin City directed the bank to enter a debit memorandum against the account for $10,020 to repay the loan. The transaction took place within the four month period prior to the filing of the involuntary petition in bankruptcy against the company.
 
 
 40
 The Trustees contend that payment of the loan was a voidable preference under the Bankruptcy Act, 11 U.S.C.A. § 96, subs. a and b. Their argument is three-pronged: (A) the pledge was invalid because notice was not given to the government as required by the Federal Assignment of Claims Act, 31 U.S.C.A. § 203; (B) the pledge was invalid under state law because of lack of notice; (C) the bank had no right of set off. The district court held that notice was not necessary to perfect the pledge because payment within twelve days perfected it. The court also held that the Bank had a right of set off. We reverse and remand.
 
 
 41
 A. The district court held that failure to comply with the Federal Assignment of Claims Act was not fatal to the validity of the pledge. We do not question that portion of the opinion. Where it appears that the government has paid or honored a claim, or no longer has any vital interest, the assignment is good between the parties or their successors in interest in spite of the fact that the government was not given notice of the assignment. Martin v. National Surety Co., 1936, 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822; Matter of Ideal Mercantile Corporation, 2 Cir., 1957, 244 F.2d 828; M. M. Landy, Inc. v. Nicholas, 5 Cir., 1955, 221 F.2d 923, 53 A.L.R.2d 1385; In re Webber Motor Co., D.C.N.J. 1943, 52 F.Supp. 742. Payment by the government to Twin City removed the case from the scope of rule expressed in National Bank of Commerce of Seattle v. Downie, 1910, 218 U.S. 345, 31 S.Ct. 89, 54 L.Ed. 1065, and brought it within the narrower limits of the Martin case.[15]
 
 
 42
 We cannot, however, agree with the district court's construction of the Louisiana law of pledge and the bankruptcy principles applicable to set off.
 
 
 43
 In order to have a preference under the Bankruptcy Act, six statutory elements must exist: (1) there must be a transfer of the debtor's property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt; (4) the transfer must be made or suffered while the debtor is insolvent, (5) within four months of bankruptcy; and (6) the effect of the transfer must be to enable the creditor to obtain a greater percentage of his debt than another creditor of the same class. See 3 Collier on Bankruptcy § 60, page 753. If any of the six vital elements is lacking, there is no preference under Section 96, sub. a. But when the requirements of 96, sub. a are met, the preference will be voidable only if, under Section 96, sub. b, the transferee had reasonable cause to believe that the debtor was insolvent at the time of the transfer.[16]
 
 
 44
 Prior to the 1950 amendment to Section 96, sub. a, an assignment of a claim without notice as required by state law to the debtor of the claim could be struck down even though the assignment was made prior to the four month period. The theory was that if the lien was never perfected according to state law, or if it was perfected some time after the transfer (assignment), it was deemed to have been made within the four month period. Also, if perfection and execution were not simultaneous the assignment was for an antecedent debt because the date of perfection controlled. See Corn Exchange National Bank & Trust Co., Philadelphia v. Klauder, 1943, 318 U.S. 434, 63 S.Ct. 679, 87 L.Ed. 884. In 1950 Section 96, sub. a was amended in order to dilute the harshness of the Klauder rule. Thus, House Report No.1293, August 22, 1949, 81st Cong. 1st Sess., states that the purpose of the amendment was to provide "that no transfer made in good faith, for a present new consideration, shall constitute a preference to the extent of such consideration actually advanced, if the provisions of applicable State law governing such transfers are complied with, with an appropriately rigid time limitation (21 days) for such perfection if such limitation is not itself prescribed by the applicable State law." As the Section stands today, if a lien, which is a transfer for purposes of the Act, is perfected under state law within twenty one days, or a shorter period if specified by state law, then the transfer is treated as if it were made when executed even though execution and perfection were not simultaneous. 11 U.S.C.A. § 96, sub. a(7). If it is treated in this manner there is no transfer for an antecedent debt, a vital element in establishing a preference.[17]
 
 
 45
 B. Therefore, the issue presented here narrows down to whether the pledge was validly perfected under Louisiana law within twenty one days[18] as required by 96, sub. a(7). The district court held that payment within twelve days perfected the pledge. Thus, the court implied, the transfer was for a new and present consideration, and the antecedent debt element of preference was lacking.[19] We are compelled to disagree with this view of Louisiana law.
 
 
 46
 Payment did not perfect the pledge. The only way a pledge of a credit evidenced by a non-negotiable instrument can be perfected in Louisiana is by delivery of the instrument to the pledgee and by written notice to the debtor on the instrument. Articles 3158, 3160, LSA-Civil Code of 1870; Commercial Bank of Alexandria v. Shanks, 1911, 129 La. 861, 56 So. 1028. See also Slovenko, Of Pledge, 33 Tul.L.Rev. 59, 106-107 (1959). It is the notice to the debtor of the credit that amounts to constructive possession of the credit. Denis, Contract of Pledge (N.O.1898), p. 29,479. Article 3160 of the Code provides:
 
 
 47
 "When the thing given in pledge consists of a credit or instrument not negotiable, the pledge shall be complete as to all the world, as soon as the debtor of such pledged credit or instrument shall have been notified in writing of the giving of such pledge."
 
 
 48
 Lack of notice will not affect the validity of the pledge as between the parties. Sambola v. Fandison, La.App., 1938, 178 So. 276. But under Section 70, sub. e(1) of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. e(1), the Trustee stands in the shoes of a general creditor who could attack the pledge. The Trustees' argument that LSA-R.S. of 1950, 9:4321-4323 changed the notice requirement in Louisiana is without merit. Those sections relate only to obligations not evidenced by a written instrument.
 
 
 49
 Since the pledge was not validly perfected under Louisiana law, the district court must inquire into the other elements of a preference to see if one existed and whether it was voidable under Section 96, sub. b.
 
 
 50
 C. We must also reverse on the issue of set off.[20] Generally, a bank may apply the debtor's deposits on his debts to the bank as they mature. 5A Michie, Banks and Banking § 114. In the absence of fraud or collusion, or an intent to effect a preference, a debtor's insolvency will not affect the bank's right of set off if the deposit was made in the ordinary course of business and the money deposited was subject to withdrawal by the depositor. First National Bank of Negaunee v. Fox, 6 Cir., 1940, 111 F.2d 810, 814. "It is well-settled", the court said in the Fox case, "that in the absence of fraud and collusion or intent to effect a preference, a bank may set off a deposit made in the ordinary course of business, and subject to withdrawal by the depositor even though it may know the depositor is insolvent at the time". However, a set off may be attacked as a voidable preference under certain circumstances.
 
 
 51
 In Cusick v. Second National Bank, 1940, 73 App.D.C. 16, 115 F.2d 150, in which the bank set off a debtor's deposits of funds that were paid pursuant to two construction contracts against two loans made by the bank, the court said that the trustees could attack the set off as a voidable preference if: (1) at the time of the deposits either the company or the bank intended them to operate as payment of the debt rather than as an ordinary deposit subject to the depositor's withdrawal; (2) at the time of the deposit the depositor was in fact insolvent; and (3) the bank had reasonable cause to believe the depositor was insolvent at that time. Under the facts surrounding the Twin City deposit we think the deposit was for the purpose of payment of the debt. As soon as Gray received the proceeds under the contract he transferred them by debit memorandum to the Bank. The deposit was made solely to repay the loan. It was a cloak for payment. See Citizens' National Bank of Gastonia, N. C. v. Lineberger, 4 Cir., 1930, 45 F.2d 522.
 
 
 52
 Thus, there was a transfer that might constitute a voidable preference.[21] Accordingly we must reverse and remand the case for the district court to make additional findings on the Trustees' third claim, for $10,020.
 
 
 53
 The judgment is affirmed in part and reversed and remanded in part.
 
 
 
 Notes:
 
 
 [1]
 11 U.S.C.A. § 107, sub. d(2) (b) provides: "Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent * * * (b) as to then existing creditors and as to other persons who become creditors during the continuance of a business or transaction, if made or incurred without fair consideration by a debtor who is engaged or is about to engage in such business or transaction, for which the property remaining in his hands is an unreasonably small capital, without regard to his actual intent."
 
 
 [2]
 "Transfers made to benefit third parties are clearly not made for a `fair consideration'. 4 Collier on Bankruptcy, (14 Ed.) p. 363. Davis v. Hudson Trust Co., 3 Cir., 1928, 28 F.2d 740, certiorari denied 278 U.S. 655, 49 S.Ct. 179, 73 L.Ed. 565; Barr & Creelman Milling & Plumbing Supply Co. v. Zoller, 2 Cir., 1940, 109 F.2d 924; Irving Trust Co. v. B. Altman & Co., 1933, 151 Misc. 504, 270 N.Y.S. 781; Hansen v. Cramer, 1952, 39 Cal.2d 321, 245 P. 2d 1059, 30 A.L.R.2d 1204
 
 
 [3]
 LSA-Civil Code, Articles 1896, 2292, 2293, 2294, 2300, 2301. See also Howe, Studies in the Civil Law (N.O. 1896), Chap. X, 170-190
 
 
 [4]
 "Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it." LSA-Civ. Code, Art. 2315
 
 
 [5]
 "Whether a fair consideration has been given for a transfer must depend on all the circumstances of the case. Fairness in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." Collier's Bankruptcy Manual (Oglebay, Kelliher and Newkirk) (1948), p. 845, discussing Section 67, sub. d
 
 
 [6]
 Section 67, sub. d(2) on which the trustees rely is taken from Section 5 of the Uniform Fraudulent Conveyances Act (not adopted in Louisiana); see 9B Uniform Laws Annotated, p. 102. Maclachlan, Handbook of the Law of Bankruptcy (Hornbook Series, 1956), page 271, states: "There are surprisingly few cases under or corresponding to Section 5 of the Uniform Act. It has been cited several times merely as a make-weight in opinions finding actual fraud or insolvency or both."
 
 
 [7]
 Subsection (d) provides a transfer is fraudulent "as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors." 11 U.S.C.A. § 107, sub. d(2) (d)
 
 
 [8]
 "The approach under § 67 [sub.] d(2) (d) is to be purely factual." 4 Collier on Bankruptcy, § 67, page 369
 
 
 [9]
 "Payee of check or bill of exchange; duties and liability — If a check or other bill of exchange is drawn by a fiduciary as such or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach or with knowledge of such facts that his action in taking the instrument amounts to bad faith. If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of, or as security for, a personal debt of the fiduciary, to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the instrument." LSA-R.S. § 9:3805
 
 
 [10]
 "Check upon principal's account; liability of bank paying — If a check is drawn upon the account of his principal in a bank by a fiduciary who is empowered to draw checks upon his principal's account the bank is authorized to pay any such check without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing such check, or with the knowledge of such facts that its action in paying the check amounts to bad faith. If, however, such a check is payable to the drawee bank and is delivered to it in payment of, or as security for, a personal debt of the fiduciary to it, the bank is liable to the principal, if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check." LSA-R.S. § 9:3808
 
 
 [11]
 The corporate resolutions provided, in part: "Further Resolved, That Pioneer Bank & Trust Company be and it hereby is authorized to honor, receive, certify, or pay all instruments signed in accordance with the foregoing resolution even though drawn or indorsed to the order of any officer signing the same or tendered for cashing, or in payment of the individual obligation of such officer, or for deposit to his personal account, and said Bank shall not be required, or be under any obligation to inquire as to the circumstances of the issuance, or use of any instrument signed in accordance with the foregoing resolution, or the application, or disposition of such instrument, or the proceeds thereof;"
 
 
 [12]
 This portion of the Trustees' claim, and the portion of the claim under the $50,125.00 item that is based on state law is allowed by the Bankruptcy Act, 11 U.S.C.A. § 110, sub. e(1), which allows recovery if a transfer or obligation violates state or federal law
 
 
 [13]
 "Cases not provided for; rules applicable — In any case not provided for in this Chapter the rules of law and equity, including the law merchant and those rules of law and equity relating to trusts, agency, negotiable instruments and banking, shall continue to apply." LSA-R.S. § 9:- 3812
 
 
 [14]
 Scott and Paton criticize Colby. 3 Scott on Trusts (2d Ed.1956), Sec. 324.5, p. 2345; 2 Paton's Digest (1942) p. 1759. The case is noted in 38 Cal.L. Rev. 495; 23 Cornell L.Q. 483; 51 Harv. L.Rev. 563; 47 Yale L.J. 994; 37 Mich. L.Rev. 160
 
 
 [15]
 The cases are collected in 12 A.L.R.2d 460. See also Note, Assignment of Government Contracts as Collateral, 101 Pa. L.Rev. 106
 
 
 [16]
 "On the other hand, where a preference as defined in § 60 [sub.] a [11 U.S. C.A. § 96, sub. a] is found to exist, there can, nevertheless, be no avoidance of such a preference under § 60 [sub.] b [11 U.S.C.A. § 96, sub. b] unless the transferee had reasonable cause to believe that the debtor was insolvent. In all such cases, the burden of proving the existence of these essential elements is upon the trustee seeking to avoid the transfer." 3 Collier in Bankruptcy, § 60, p. 757
 
 
 [17]
 The general rule is that a transfer is made whenperfected. 11 U.S.C.A. § 96, sub. a. Thus, but for 96, sub. a(7), all transfers that were not perfected when executed would be transfers for an antecedent debt.
 
 
 [18]
 Louisiana law does not require a specific time limit for perfecting a pledge. See Articles 3158, 3160, LSA-Civ.Code of 1870
 
 
 [19]
 A transfer for a new and present consideration, even one within the four month period, can never be attacked as a preference. Wolf v. Aero Factors Corp., 2 Cir., 1955, 221 F.2d 291
 
 
 [20]
 The bank's right of set-off in relation to bankruptcy problems is governed by 11 U.S.C.A. § 108 which provides: "Setoffs and counterclaims — a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid. b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable under subdivision g of section 93 of this title; or (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy. July 1, 1898, 541, § 68, 30 Stat. 565; June 22, 1938, c. 575, § 1, 52 Stat. 878."
 
 
 [21]
 Ordinarily a deposit in a bank is not a transfer under Section 96(a) and cannot be a preference. Studley v. Boylston National Bank, 1913, 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313; New York County Nat. Bank v. Massey, 1904, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380. If, however, the deposit is given by the depositor or received by the bank as payment of a debt, a transfer occurs that might be a voidable preference. Mechanics & Metals National Bank of City of New York v. Ernst, 1913, 231 U.S. 60, 34 S.Ct. 22, 58 L.Ed. 121