In re Trent GAITES, Bankrupt.

William FLATAU as Trustee, Plaintiff

v.

S. ATEF, Defendant.

Civ. A. No. 78–28–Ath.

United States District Court,
M. D. Georgia,
Athens Division.

Feb. 21, 1979.

Thomas M. Strickland, Athens, Ga., for bankrupt Gaites.

B. Andrew Prince, Pleger, Duderwicz & Prince, Athens, Ga., for plaintiff.

Grady C. Pittard, Jr., Athens, Ga., for defendant.

OWENS, District Judge:

Defendant S. Atef appeals from the bankruptcy judge's order of May 23, 1978, setting aside as a voidable preference a transfer by her then son-in-law, the bankrupt, of a one-half undivided interest in five duplex housing units located in Athens, Clarke County, Georgia.

The standard for this court's review of its bankruptcy judge's order is set forth in Bankruptcy Rule 810 which provides:

> Upon an appeal the district court may affirm, modify, or reverse a referee's judgment or order, or remand with instructions for further proceedings. The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge of the credibility of the witnesses.

Findings of fact may be clearly erroneous if they are "unsupported by substantial evidence, contrary to the clear weight of evidence, or induced by an erroneous view of the law." *In re Panama-Williams Corp.*, 235 F.Supp. 729, 732 (S.D.Tex.1964).

The court's first responsibility is to determine whether or not any of the findings of fact are clearly erroneous. A careful reading of the transcript causes the court to conclude that none of the material facts were or are now in dispute, so that it is unnecessary for the court to give due regard to the opportunity of the bankruptcy judge to judge the credibility of the witnesses.

The bankruptcy judge found the facts as follows. Portions to be hereinafter discussed as possibly being clearly erroneous are underlined.

### "FINDINGS OF FACT

"The facts, succinctly and chronologically stated, that culminated in the filing of the complaint raising the issue of a voidable preference are as follows: The defendant, S. Atef (maiden name), is a native and citizen of Iran. Her daughter, Sharzad F. Gaites, a student at the University of Georgia, married Trent P. Gaites (bankrupt) on December 21, 1972.

"On July 29, 1974, while visiting with her daughter and son-in-law, S. Atef (defendant) executed a contract to purchase five (5) parcels of land with a duplex apartment located on each (realty). The sales contract was accepted by the sellers on July 30, 1974. Tendered as earnest money was the personal check of defendant, dated July 30, 1974, for the sum of $5,000.00. Immediately after executing the sales contract, defendant returned to Iran.

"On September 3, 1974, the closing date, the sale was consummated in the following manner: At the election of defendant, five (5) warranty deeds were executed by Sam B. Welch and David D. Saye, Jr. (sellers) with title to the realty in the names of Trent P. Gaites and Sharzad F. Gaites (grantees). These warranty deeds were filed for record September 5, 1974. After recordation, defendant's realtor retained possession of the deeds, with copies thereof furnished to defendant in Iran and Trent P. Gaites in Athens, Georgia.

"The down payment of $20,000.00, including the earnest money, was paid to the sellers from the personal funds of defendant. As part of the consideration, the grantees executed five (5) promissory notes in favor of the sellers in the principal sum of $3,000.00 each, and as security therefor

transferred the realty back to the sellers by five (5) security deeds. For a consideration of $20,000.00, Trent P. Gaites and Sharzad F. Gaites executed a security deed to the realty in favor of defendant. This security deed was never filed for record. A promissory note evidencing the indebtedness was not executed by them. This security deed does not recite that the transfer was made subject to outstanding first and second security deeds. As a part of the consideration for the purchase of the realty, Trent P. Gaites and Sharzad F. Gaites assumed a security deed outstanding in favor of Clarke Federal Savings and Loan Association.

"Trent P. Gaites and Sharzad F. Gaites filed joint income tax returns for the year 1974. As deductions, they took the depreciation on the duplexes and interest paid on the promissory notes.

"Trent P. Gaites and Sharzad F. Gaites were to manage the duplexes, receive the monthly rentals therefrom, and deposit the income to the account of the defendant. Without the knowledge of defendant, Trent P. Gaites withdrew $5,441.22 from her checking account for his personal use.

"Defendant returned to the United States, the exact time of arrival and departure being unknown, and was in the United States on July 18, 1975. During defendant's temporary return to the United States prior to July 18, 1975, Trent P. Gaites issued to defendant an undated personal check for the sum of $5,441.22. Upon the face of the check are the words: 'Repayment of money taken from account.' This check has never been satisfied, and neither was defendant listed as a creditor in the bankruptcy schedules of Trent P. Gaites.

"On July 18, 1975, in consideration of love and affection, Trent P. Gaites and Sharzad F. Gaites transferred the realty to defendant by warranty deed, subject, nevertheless, to the first security deed of Clarke Federal Savings and Loan Association, and the junior security deeds in favor of Sam B. Welch and David D. Saye, Jr. On the date of the transfer, Trent P. Gaites and Sharzad F. Gaites were in arrears on monthly installments due Clarke Federal Savings and Loan Association and Sam B. Welch and David D. Saye, Jr. under the security deeds outstanding, respectively. This warranty deed was recorded September 4, 1975.

"At the time of this transfer, Trent P. Gaites was insolvent, and defendant knew or had reasonable cause to believe that Trent P. Gaites was insolvent. From time to time, Trent P. Gaites and Sharzad F. Gaites borrowed money from the defendant. The transfer was made within four months of the filing of his bankruptcy petition, and was made for an antecedent debt.

"On November 24, 1975 Trent P. Gaites filed his voluntary petition in bankruptcy.

"Defendant returned to Iran after her temporary sojourn to the United States prior to July 18, 1975, and moved permanently to the United States in December 1975."

■ The first clearly erroneous finding of fact is that "for a consideration of $20,-000" the bankrupt and his wife, the defendant's daughter, executed a security deed to the realty in favor of the defendant. The undisputed facts as found in the testimony of real estate agent Jeffrey Howard, the bankrupt, defendant's daughter, and the defendant show that the defendant then residing in Iran came to visit her daughter and son-in-law, the bankrupt, in Athens, Georgia. Her son-in-law recommended Mr. Howard as a real estate agent, and Mr. Howard showed her five duplexes then under construction that were for sale. Using her own money the defendant paid Mr. Howard $5,000.00 and signed a sales contract for the property on July 29, 1974, which was accepted by the sellers the following day. Because of her plans to return to Iran and in her absence to entrust the management of the duplexes to her daughter and son-in-law, the defendant elected to have the deeds drawn in the names of her daughter and son-in-law. Warranty deeds and second deeds to secure debt as to the remaining sellers' equity were prepared and executed September 3, 1974. At the same time Mr. Howard acting as agent for both the sellers and defendant caused a deed to

secure debt but no promissory note, to be executed by the bankrupt and his wife, defendant's daughter, to the defendant. This represented Mr. Howard's concept of what ought to be done to protect the defendant's investment; neither the defendant nor the bankrupt nor defendant's daughter directed that the security deed be prepared or executed.

At the time of execution of the various deeds on September 3, the additional $15,000.00 required to be paid by the defendant was not paid. The bankrupt wrote the defendant on September 7 telling her how much money was needed to pay the $15,000.00 and closing expenses; the defendant mailed her check drawn on her account in the Citizens and Southern National Bank, Athens, Georgia, for $15,000.00 to the bankrupt; and the bankrupt then paid the sellers. Neither the bankrupt nor his wife, defendant's daughter, used any of their own money to pay for the acquisition of the duplexes.

Mr. Howard by letter dated October 8, 1974, mailed copies of all of the deeds and closing documents to the defendant in Iran. As recited in his letter of transmittal he sent her only a copy of the security deed signed by the bankrupt and her daughter. In doing so Mr. Howard stated:

> Enclosed please find documents pertinent to the closing of your five duplexes on September 3, 1974. I will inventory the documents below and the number beside each will correspond to the red number on the papers themselves.
>
> \* \* \* \* \* \*
>
> 8. A copy of the security deed evidencing $20,000 due to you from Trent and Sha Sha. This documents provides you with security inasmuch as your money was used to purchase the property, and the property is in the name of Trent and Sha Sha. This document has not been recorded as would usually have been done, but provides Trent and Sha Sha, you, and me with a copy as evidence of the indebtedness. My agreement with Trent and Sha Sha is that none of the property will be sold without your written consent. When the time comes to sell any or all of the property, I will write to you advising you to sell and specifying the terms. I will also include a prepared letter from you to me, authorizing me to dispose of the property in your behalf.

The original deed to secure debt was not recorded, was not sent to the defendant and has not since been accounted for. Only after bankruptcy did the bankrupt learn it was never recorded.

It was the understanding of Mr. Howard as agent, the defendant, defendant's daughter and the bankrupt that the title to the duplexes was in the names of the bankrupt and the defendant's daughter to enable them to manage the property for the defendant until such time as she moved from Iran to the United States. It was the further understanding of these persons that the bankrupt and defendant's daughter would rent the duplexes, collect the rent, pay the monthly first and second loan payments and other expenses, and deposit the net or remaining amount in defendant's account in the Citizens and Southern National Bank.

Since the bankrupt and defendant's daughter in receiving and disbursing the $15,000 earnest money balance to the sellers were acting solely as defendant's management representatives and since the first $5,000 was paid directly from defendant through Mr. Howard to the sellers, the bankrupt and his wife, defendant's daughter, did not receive any loan proceeds from the defendant, and the total money that passed through their hands was $15,000, not the $20,000 recited in the deed.

This court therefore finds that the bankruptcy judge erroneously concluded that the deed to secure debt was executed in consideration of $20,000. He should have concluded that there was no monetary consideration for the execution of the deed and that its sole purpose was to inartfully evidence that the defendant owned these duplexes which were being managed by the bankrupt and his wife, defendant's daughter.

■ Next, the bankruptcy judge found that on July 18, 1975, "in consideration of love and affection," the bankrupt and defendant's daughter transferred the realty to Mrs. Atef by warranty deed. While the deed does recite "love and affection" as the consideration, it clearly appears that the transfer of legal title to the property to Mrs. Atef was intended to terminate the prior management arrangement since Mrs. Atef was settling permanently in this country and was no longer in need of the management services of her son-in-law and daughter. "Love and affection" usually connotes a gift. This was no gift; it was a conveyance of what the defendant had already paid for and had been held for her by the grantors.

■ The judge also concluded that "Trent P. Gaites and Sharzad F. Gaites were in arrears on the monthly installments due" to the mortgage holders. This finding implies that the Gaites were to be personally liable for the obligations. A contrary conclusion follows from what has been said. The Gaites were to make payments from the income received from the property and not from their personal funds. The Gaites never used their personal funds to meet any of the obligations arising from the duplexes. In fact Mrs. Atef testified that she had to pay property taxes on the duplexes from her own funds. (Tr. 127). The payments were in arrears but the responsibility was that of the bankrupt and defendant's daughter as managers for the defendant and not personally.

■ The judge also concluded that Mrs. Atef "knew or had reasonable cause to believe that Trent P. Gaites was insolvent." This conclusion is also unsupported by the evidence and is, therefore, clearly erroneous. Mrs. Atef was in the United States on one or two occasions in 1975 prior to her permanent arrival in December 1975. Nothing in the record shows exactly when she was here or for how long. It is uncertain whether she was present when the warranty deed was executed although her signature appears on it. In reaching his conclusion that Mrs. Atef knew or should have known of the bankrupt's insolvency, the judge relied on the fact that the bankrupt had withdrawn $5,441.23 from Mrs. Atef's account without her approval and had given her an undated, unsatisfied check to cover that amount. The judge concluded that from the knowledge of the unauthorized withdrawal and unsatisfied reimbursement, Mrs. Atef was put on inquiry notice of the bankrupt's financial troubles.

While the precise time at which Mrs. Atef learned of the withdrawal is unclear, Mr. Gaites testified that he did not give Mrs. Atef the check until December 1975, a month after he had filed for bankruptcy. Any inquiry notice inherent in the check did not come to light until several months after the transfer. Under the bankruptcy act the creditor must have notice of insolvency at the time of the transfer.

■ The fact that the payments to the mortgagees were in arrears was not sufficient to give Mrs. Atef notice of the bankrupt's insolvency because it was intended that the payments were to be made from her rent money and not by the bankrupt. That the payments were in arrears does not therefore reflect on the bankrupt's financial condition.

■ Furthermore, the bankruptcy judge found that Mrs. Atef had made loans to the bankrupt and his wife. The clear implication of his conclusion is that she was a creditor of the bankrupt in other matters and should have taken an interest in his financial condition. While Sharzad Fakhrnea stated that Mrs. Atef had made loans to her and her former husband, everything else contradicts this statement. Mrs. Atef testified that she *gave* Sharzad anything she needed. The bankrupt did not list Mrs. Atef as a creditor in his bankruptcy petition. By amendment to his petition ordered by the bankruptcy judge, the bankrupt described the properties transferred to Mrs. Atef in the July 1975 warranty deed but claimed that he held only bare legal title for the benefit of Mrs. Atef—the true owner. Mrs. Atef has never sought to prove a claim against the estate. The mak-

ing of a loan is an act that contemplates repayment. There is no evidence of a loan being made or of any repayment at any time of anything other than the money taken without authority from defendant's bank account.

 Finally, the bankruptcy judge concluded that the July 18, 1975, transfer "was made for an antecedent debt." As previously shown, the purchase arrangement whereby Mrs. Atef paid $20,000.00 and the Gaites took bare legal title to the property was not a debt transaction, therefore, the transfer was not and could not have been on account of an antecedent debt.

The bankruptcy judge set aside the transfer as a voidable preference under 11 U.S.C.A. § 96(a) only to the extent of the bankrupt's one-half undivided interest in the property. Therefore, Mrs. Atef holds the other one-half interest free of the trustee in bankruptcy.

 To sum up the facts, Mrs. Atef was in the United States only intermittently during the relevant time periods. Many of the dealings were carried on through the mails over a long distance. She had little or no understanding of the legal significance of the transaction and documents and was totally at the mercy of Jeff Howard, the real estate salesman, who displayed little understanding of the implication of the steps he took to protect her. Under the circumstances she was also compelled to place complete trust in her son-in-law. In the end this trust was found to be misplaced but the tendency of Mr. Gaites to take an "all-in-the-family" attitude toward the property is a natural, though reprehensible, failing. This court in reversing the court below has taken all these circumstances into consideration. Justice in this case demands that this court look beyond the bare legal structure of the transactions, haphazzardly erected by misapplied forms and documents; rather the court must look to the true intentions of the parties evidenced by the undisputed facts in the record. In divesting the trustee in bankruptcy of the one-half undivided interest in the property, this court perceives no unfairness

to the creditors of the bankrupt. The record is devoid of any evidence that any creditors advanced money or value to the bankrupt on the strength of his record ownership of the properties.

In order to have a preference under the Bankruptcy Act, six statutory elements must exist: (1) there must be a transfer of the debtor's property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt; (4) the transfer must be made or suffered while the debtor is insolvent, (5) within four months of bankruptcy; and (6) the effect of the transfer must be to enable the creditor to obtain a greater percentage of his debt than another creditor of the same class. See 3 Collier on Bankruptcy § 60, page 753. If any of the six vital elements is lacking, there is no preference under Section 96, sub. a. But when the requirements of 96, sub. a are met, the preference will be voidable only if, under Section 96, sub. b, the transferee had reasonable cause to believe that the debtor was insolvent at the time of the transfer. *Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823, 834–835 (5th Cir. 1959) (footnote omitted). Since Mrs. Atef is not a creditor, the transfer of the property from the bankrupt to her in July 1975 was not a transfer to a creditor on account of an antecedent debt to enable her to obtain a greater percentage of her debt than another creditor. The transfer merely terminated the management arrangement and is, therefore, not subject to being set aside as a voidable preference.

 While the property management arrangement was terminated and legal title to the property was properly transferred to Mrs. Atef, it is encumbent on this court to determine the precise nature of the arrangement. On appeal to this court the defendant argues that an implied trust was created for her benefit. Georgia law recognizes an implied trust "[w]henever the legal title is in one person, but the beneficial interest, either *from the payment of the purchase money* or other circumstances, is either wholly or partially in another." Ga.

Code Ann. § 108–106(1) (italics supplied). An implied trust reflecting the true intentions of the parties "may be established by parol evidence, although the effect of such evidence is to alter or vary a written instrument." *Hancock v. Hancock,* 205 Ga. 684, 689, 54 S.E.2d 385, 389 (1949). These circumstances demand a finding of an implied trust in the duplexes for Mrs. Atef's benefit. The implied trust existed until July 1975 when the bankrupt dissolved the trust by transferring legal title to her.[1]

Unquestionably Mrs. Atef paid $20,000.00 toward the purchase of the property and Mr. and Mrs. Gaites took bare legal title to manage the property for Mrs. Atef's benefit. All witnesses agreed that the property was Mrs. Atef's and that she should receive the net income from the rents. Therefore the undisputed evidence reveals a classic example of an implied purchase money trust. The trustee in bankruptcy takes the bankrupt's property subject to the prior implied trust for the benefit of another. *See In re Clemens,* 472 F.2d 939 (6th Cir. 1972); *In re Smith,* 348 F.Supp. 1290 (E.D.Va.1972). Under Georgia law, however, an implied trust exists in the property only to the extent of the purchase money actually paid. *See Brock v. Gerlach,* 229 Ga. 295, 191 S.E.2d 38 (1972).

Even had the bankrupt not transferred legal title to Mrs. Atef or even if the July 1975 transfer were a voidable preference, Mrs. Atef would be protected, at least to the extent of her investment under the doctrine of implied trusts.

Finally, even assuming that the July 1975 warranty deed is a voidable preference, the bankruptcy judge was in error in holding that the security deed was merged with the greater estate in the July 1975 warranty deed thereby extinguishing any security interest in the property. Georgia law provides that "[i]f two estates in the same property shall unite in the same person in his individual capacity, the lesser estate shall be merged in the greater." Ga. Code Ann. § 85–710. Despite this absolute language, whether a merger of estates occurs is governed by the intentions of the parties and principals of equity. *See Pope v. Hammond,* 168 Ga. 818, 149 S.E. 204 (1925). The Georgia Supreme Court has held that a merger of estates would not occur if the result would extinguish a loan, contrary to the expectations and intentions of the parties. *Fraser v. Martin,* 195 Ga. 683, 25 S.E.2d 307 (1943). Under these circumstances neither Mrs. Atef nor her son-in-law intended that Mrs. Atef would forfeit the purchase money in the property as a result of the July 18, 1975, warranty deed.

More fundamentally, a merger could not occur because the greater estate granted by the warranty deed was set aside and declared null and void by the bankruptcy judge. There is no merger of estates when the greater estate is void and has been avoided. *See* 31 C.J.S. Estates § 124. Even assuming that the July 18, 1975 warranty deed was a voidable preference, this court's interpretation of the doctrine of merger of estate gives the security deed viability independent of the warranty deed. Therefore, since an unrecorded security deed would give Mrs. Atef an interest in the property superior to that of the trustee in bankruptcy, *see In re Clifford,* 566 F.2d 1023 (5th Cir. 1978), there is an alternative basis for protecting Mrs. Atef at least to the extent of her investment.

Therefore, the order of the bankruptcy judge setting aside the conveyance of the one-half undivided interest in the realty and buildings from the bankrupt to the defendant is hereby reversed.

IT IS HEREBY ORDERED that the Trustee in bankruptcy reconvey the one-half undivided interest in the property to Mrs. Atef.

SO ORDERED, this the 21st day of February, 1979.

---

1. An implied trust is also the appropriate remedy whether the bankrupt is viewed as Mrs. Atef's agent for the purchase of property, *see Woodruff v. Hennessy,* 210 Ga. 819, 82 S.E.2d 863 (1954); *Chastain v. Smith,* 30 Ga. 96 (1860), or whether this is a case of mistake which would warrant reformation of the warranty deeds. *See McFadden v. Dale,* 155 Ga. 256, 116 S.E. 596 (1922).