# COMMONWEALTH
## vs.
## COLIHAN

Indictment No. 030302

Superior Court Department
Trial Court of the
Commonwealth of Massachusetts

February 20, 1981

Stephen Needle for the plaintiff.
Stephen Hrones for the defendant.

## FINDINGS OF FACT, RULINGS OF LAW AND MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO SUPPRESS THE TESTIMONY OF LINDA DIXON

ABRAMS, J. The issue before this Court is the admissibility of the testimony of Linda Dixon, who on February 1, 1980, underwent hypnosis approximately three hours after having given a statement to a Boston police detective incriminating the defendant as a suspect in the murder of Susan Rose.

Although counsel for the defendant agrees that Linda Dixon gave very little additional information while under hypnosis than that which she said in her prior statements to the police, he contends that once having been hypnotized she will not always be able to distinguish between her memory before hypnosis and the created memory that is the product of the suggestive hypnotic procedure thus rendering cross-examination very difficult and thereby denying the defendant his right of confrontation and due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

The defendant further asserts in his motion to suppress the testimony of Linda Dixon, that having undergone hypnosis she is incompetent to testify at trial as her testimony is tainted by virtue of the pre-trial hypnotic session and therefore inherently unreliable and inadmissible rather than being an issue of credibility for the jury's consideration.[1]

Here, Linda Dixon's testimony at the voir dire hearing on defendant's motion to suppress was not developed as the result of hypnosis as was the victim's testimony in Commonwealth v. A Juvenile, 1980 A.S. 2319 for there the term "hypnotically aided testimony" was used to describe testimony that was not available from the hypnotized witness before hypnosis but became available from that witness after hypnosis. Nor is this a case where Linda Dixon's testimony is based solely on her memory being revived by hypnosis or where the defendant is being identified by a witness and/or a victim to a crime who underwent hypnosis.

In accordance with the decision in Commonwealth v. A Juvenile, supra, this Court makes the following findings of fact and rulings of law concerning the reliability of Linda Dixon's testimony and the suggestibility of the hypnotic procedures that were followed in denying the defendant's motion to suppress and in ruling that the Commonwealth has met its burden in establishing by clear and convincing evidence that the hypnotically induced statement of Linda Dixon has sufficient reliability to justify its introduction in evidence, or other use, if required, to refresh her recollection at trial and that Linda Dixon is otherwise competent to testify as a witness at the trial of Scott Colihan. The evidence relevant to the issues considered herein is as follows:

Officer James McManus, a veteran of 21 years on the Boston Police Department, testified that at approximately 2:30 A.M. on February 11, 1980, while operating a police van on Newbury Street, he observed a young girl waving to him to stop. On inquiry, the young girl said that she was freezing and unable to get a cab to take her to the Y.W.C.A. where she lived. Once in the van, she identified herself as Linda Dixon and engaged in conversation inquiring as to whether or not they had found the person who killed Susan Rose, indicating that she knew the person who killed her and gave the name of Scott Colihan as the person whom she was with in the early morning hours on the day Susan Rose was found murdered, that he had left Linda Dixon in his apartment at approximately 2:30 A.M. for 3½ to 4 hours and when he returned he was covered with blood.[2]

Officer McManus testified further that she agreed to talk to detectives in the morning. Further conversation with Officer McManus revealed that a few weeks subsequent to Susan Rose's murder, Linda Dixon said that while at Father's Five sitting with a fellow at the bar, Scott Colihan came over to her and said, "You are my main alibi", or words to that affect, mentioning the name of the fellow with whom she was sitting at the time.

After taking Linda Dixon to the Y.W.C.A., Officer McManus testified that he contacted

Detective Doris at Station 4 and related to him the circumstances of his conversation with Linda Dixon and the information was given to Detective James Chaisson of the Homicide Unit of the Boston Police Department.

Detective Chaisson, a 30 year veteran of the Boston Police Department, testified that he was the chief investigating officer in the death of Susan Rose and as a result of being contacted by Officer McManus of Station 4, he went with Detective Madden on the morning of February 1, 1980 to see Linda Dixon at the Y.W.C.A. For the purpose of asking her to come to police headquarters to tell the story that she had previously related to Officer McManus concerning the defendant.

He further testified that at approximately 1:30 P.M. she arrived at headquarters (she lived but three blocks away) and proceeded to relate in narrative form to Detective Spencer and himself what occurred on October 30, 1979[3] and that the interview lasted for 30 to 45 minutes. He further testified that he reviewed his notes with her after the interview and that she responded affirmatively when asked, "if this is what happened". When he finished the interview he asked her what she thought of the possibility of going under hypnosis because she said that she was' at Father's Five a couple of weeks after October 30, 1979 with somebody but wasn't sure of his name and that one of his reasons for asking her to undergo hypnosis was to see if she would remember who that person was (Tr-76). Although Linda Dixon testified that she gave Detective Chaisson at the 1:30 P.M. interview on February 1, 1980, the name of "Dale" as being the person with whom she was sitting at the bar at Father's Five when she next saw the defendant after October 30, 1979. Detective Chaisson testified that he did not believe that she gave him any name at that interview but did mention the name "Dale" at the hypnotic session.[4]

In either event, Detective Chaisson independently verified and otherwise corroborated this information by interviewing one Dale Lunden who confirmed the fact that during the first or second week in December of 1979, the defendant came into Father's Five and told Linda Dixon that he was a suspect in the murder of Susan Rose and that he would use her as an alibi (Exhibit #4).

Detective Chaisson further testified that he brought Linda Dixon to District 5 in Hyde Park that afternoon where he met Detective Patrick J. Brady, Director of the Hypno-Investigation Unit of the Boston Police Department and that other than giving to him the 1-1 Police Report (Exhibit #5), he did not discuss with Detective Brady what Linda Dixon had told him at the 1:30 P.M. interview. He also testified that he was satisfied with Linda Dixon's statement but because of a prior experience with hypnosis which proved beneficial, he thought that by her undergoing hypnosis, she would remember some additional facts.

Detective Patrick J. Brady, a Boston Police officer for 23 years and Director of the Hypno-Investigation Unit, testified that he is a graduate of Northeastern University with a Bachelor of Science degree in Law Enforcement and that he is presently a candidate for a Master's Degree in Criminal Justice. Since 1971, he has been an Instructor in Criminal Investigation and other related law enforcement courses at Northeastern University. He testified as to his training in hypnosis, having been introduced to it in 1964, including programs, seminars, and symposiums attended. (Exhibit #9 in his Curriculum Vitae).

In 1979, Detective Brady attended the comprehensive four-day course covering the theory and practical applications of hypnosis techniques to criminal investigation and law enforcement sponsored by the Law Enforcement Hypnosis Institute, Inc. in Los Angeles, California (Exhibit #11) of which Dr. Martin Reiser is the President. (Exhibit #10 is the Curriculum Vitae of Dr. Reiser who testified for the Commonwealth). Presently Detective Brady is the President of the Massachusetts Law Enforcement Hypnologists Organization (Tr. 3-33).

Detective Brady further testified (Tr. 3-39) that he received a phone call from Detective Chaisson who had interviewed a young lady who was unable to recall who was present when a statement was made to

her by a suspect in a bar in Boston and asked as to my availability to conduct a hypnotic session; that subsequently he learned that a person was murdered, that the subject had been with the suspect on the preceding night and that subsequently the suspect saw her in a bar and said to her that "the cops think I murdered Susan Rose and you're going to be my alibi. You're going to say that I was with you all night". (Tr. 3-44). Detective Brady testified that from the information he had received, Linda Dixon was unable to say who was present at the bar when the suspect made the above statement.

Although the pre-induction interview of Linda Dixon by Detective Brady was not recorded, Detective Brady testified at length as to his conversation with Linda Dixon prior to the hypnotic session especially as to her willingness to undergo hypnosis. A careful reading of the transcript regarding Detective Brady's pre-hypnotic interview of Linda Dixon as well as a reading of the taped transcript of the hypnotic session (Exhibit #7) and listening in open court to the recording of the taped hypnotic session conducted by Detective Brady fails to disclose any clear example of explicit or implicit suggestion to the subject which unmistakably communicated to her what was wanted by the interrogating hypnotist. Although it would have been desirable and at best an ideal or otherwise preferred procedural safeguard to have had both the pre and post-hypnotic interviews of Linda Dixon recorded on tape, the fact that this was not done does not prove to the satisfaction of the Court that the taped hypnotic session (Exhibit #7) was impermissibly suggestive, that coercive conduct occurred prior to or subsequent to the hypnotic session or that the hypnotically aided testimony was unreliable under the totality of the circumstances so as to require a per se exclusion of Linda Dixon's testimony from that of any other witness who is subjected to an alleged suggestive pre-trial procedure. Also, as previously stated, it was agreed to by counsel that very little additional information was obtained from Linda Dixon as a result of her being hypnotized other than the name of Dale being given, the name of the person who was present with her when the defendant saw her in December, 1979 at Father's Five, that on returning to his apartment his jeans were torn and that he had some blood on his neck and on his arms in addition to where she observed blood on the defendant prior to her undergoing hypnosis.

Linda Dixon testified that she was reciting the facts from her own recollection, that she was able to recall what she said under hypnosis and was able to see everything while under hypnosis in much clearer detail as to what occurred on October 30, 1979, that she could distinguish between what she said to Officer McManus and Detective Chaisson prior to hypnosis from what she said while under hypnosis from her prior statements (Tr. 376 1/7/81).

The Commonwealth urges this Court to follow those jurisdictions that have allowed an individual not presently hypnotized to testify at a criminal trial concerning matters to which the witness' memory was restored through pre-trial hypnosis. See 92 A.L.R. 3/d 442. See, **Harding v. State,** 5 Md. App. 230, 246 A.2d 302, **cert. denied,** 395 U.S. 949 (1968), where in allowing the witness to testify, the Court emphasized the fact that her testimony was substantially corroborated by other evidence. In **U.S. v. Miller,** 411 F.2d 825 (1969), the key government witness who was hypnotized before trial for the purpose of inducing recollection of certain gaps in his memory was not disqualified from testifying at a new trial.

In **Creamer v. State,** 205 S.E.2d 240 (1974), a case very similar to the facts in this case, a woman's testimony, which was allegedly tainted by virtue of pre-trial hypnotic sessions conducted by a police-affiliated psychologist to help her to remember certain details of two killings, which she had forgotten because of lapse time and her use of amphetamines, was held admissible. There the Court rejected the defendant's contention that her testimony should have been excluded as incompetent and hearsay and found that the hypnotic sessions did not taint her testimony so as to render it inadmissible. In **Creamer,** the witness related to the authorities the **principal**

facts and details of the killings prior to her sessions with the psychologist (emphasis supplied) and both were cross-examined extensively and thoroughly at trial. Here, Linda Dixon related to the police the principal facts and details of her encounter with the defendant on the night it is alleged Susan Rose was killed on three occasions within a 12-hour period prior to her hypnotic session and both the witness and the hypnologist were extensively and thoroughly cross-examined at the voir dire hearing. Also, the primary purpose for the hypnotic session which occurred three hours after Linda Dixon was interviewed by Detective Chaisson was made clear to the Court i.e. to see if Linda Dixon could remember the name of the person whom she was with when she next saw the defendant after October 30, 1979 at Father's Five. Under hypnosis, she gave the name of the person as Dale and as testified to by Detective Chaisson, this fact was independendently corroborated and otherwise verified by his subsequent interview of Dale Lunden who admitted being in the company of Linda Dixon in early December, 1979 at Father's Five when the defendant came in and engaged Linda Dixon in conversation.

Referring to Harding v. State, supra, the witness on the stand recited the facts and stated that she was doing so from her own recollection. The Court in admitting into evidence her testimony concluded that the fact that she had told different stories or had achieved her present knowledge after being hypnotized concerned only the question of the weight, rather than the admissibility of the evidence. (emphasis supplied.)

Also, the hypnotist's opinion concerning the reliability of the memories induced by pre-trial hypnosis was held to have been properly received since they corresponded with those she made after being awakened from the hypnotic trance. In State v. McQueen, 244 S.E. 2d 414 (1978), the fact that the testimony of the prosecution's sole eyewitness was refreshed by hypnosis a few weeks prior to trial but more than 5 years after the killings, was held to affect only the credibility and not the admissibility

of her testimony. In rejecting the defendant's appeal, the Court distinguishes State v. Pierce, 207 S.E. 2d 414 (1974) and Greenfield v. Commonwealth, 204 S.E. 2d 414 (1974), on the ground that here the testimony concerned what the witness presently remembered about events seen and heard by her, rather than extra judicial statements made by a person under hypnosis.

In McQueen, supra, the Court found no merit in the defendant's contention that it was error to admit the testimony of Barbara Kiser for the reason that it was the result of her hypnosis prior to trial. The Court said that the circumstance that this witness was hypnotized prior to trial would bear upon the credibility of her testimony concerning the occurences at the Norris house at the time the two women were killed, but would not render her testimony incompetent and that her credibility was for the jury.

In holding testimony following hypnosis to be competent, the Court cites Wyller v. Fairchild Hiller Corp., 503 F.2d. 506 (9th Cir. 1974) and Kline v. Ford Motor Co., Inc. 523 F.2d 1067 (9th Cir. 1975), considered by authorities to be the two leading civil cases involving the pre-trial hypnosis of a witness, wherein it was held that:

1) Wyller's testimony was not rendered inherently untrustworthy by his having undergone hypnosis, and

2) the witness' present memory depended upon refreshment claimed to have been induced under hypnosis goes to the credibility of her testimony not to her competence as a witness.

The defendant argues in favor of a per se exclusion of a witness's entire testimony who has undergone pre-trial hypnosis and claims that such testimony is inadmissible under (1) the standard of reliability enunciated in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923) and (2) on the theory that hypnosis alters a witness' memory irreversably and therefore hypnotically influenced testimony is unreliable.[5]

Under the Frye rule, the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the

results, are scientifically reliable as accurate. The defendant contends that the results of polygraph, breathalyzer and spectograph testing is analogous to and can be equated with hypnotically aided recall and cites only **State v. Mack**, 292 N.W.2d 764, 772 (Minn. 1980) which analyzes hypnosis under the Frye rule. But see **Commonwealth v. Lykus**, 367 Mass. 191, 198 (1975) which discusses the Frye standard in admitting voiceprints.

The Supreme Judicial Court, in its first decision to discuss the admission of hypnotically aided testimony, left the application of the Frye rule an open question. **Commonwealth v. A Juvenile**, Mass. Adv. Sh. (1980) 2319, 412 N.E.2d 339. The Court stated:

> We need not decide now whether the rule of the Frye case appropriately should be applied to test the admissibility of hypnotically aided testimony ... Hypnotically aided testimony is different in character [than testimony based on the application of scientific principles] but consideration of the Frye rule, or some modification of it, may nevertheless be appropriate in such a situation. **Id.** at 2234, 412 N.E.2d at 342-43.

The majority of authority, however, is squarely against the application of Frye to hypnotic recall, and this court is in agreement since the result sought through hypnosis is different than the result sought by polygraph, breathalyzer or voiceprint testing. A polygraph seeks to determine whether the person being tested is telling the truth by measuring body reactions. Breathalyzer and voiceprint tests measure bodily characteristics. Hypnosis, on the other hand, seeks to retrieve what the person previously saw or heard. Properly conducted, hypnosis can elicit an accurate account of a person's recollection of his or her perception. However, the original perception itself may or may not be an accurate account of what actually happened.

Human memory is seldom, if ever, a verifiable replica of remembered events (Orne Tr. 262-65, 270, 292, Reiser Tr. 545, 1/9/81). Memory is only memory and not, per se, truth or historicaly accuracy;

memory must be assessed by some other criterion to make the further judgment that it is reliable as historically accurate (Orne 2/257-8). Hypnotically evoked recollection suffers from the same shortcomings as recollection achieved by any other means, and it should be accorded the same credit as recollection attained by any other means. See, generally, Spector and Foster, "Admissibility of Hypnotic Statements; Is the Law of Evidence Susceptible?" 38 Ohio St. L.J. 567 (1977).

> Perception and memory are the product of an intricate blend of neurological, psychological, and physiological processes: both perception and memory are profoundly affected by behavioral and motivational factors that distort the raw data to be perceived and remembered.

(p. 587)

Even though the nature of memory is such that it cannot be objectively tested for veracity, information supplied through human recall is by far the largest component of evidence admitted in courts of law. If some indicator of veracity were required as foundation before a witness could testify based upon his recall, the courts would be deprived of their main source of evidence. Yet this is precisely what the defendant maintains is necessary herein, by virtue of Frye.

If non-hypnotic human recall and non-hypnotic memory refreshment methods were to be judged under the Frye rule all live testimony might very well be excluded. As the expert testimony in the instant case reveals, the scientific knowledge of human recall is rudimentary and there is no generally accepted theory of human recall (Orne 2/263; Reiser 5/35-40). Indeed, human recall is the focus of major theoretical controversies in the scientific community, with advocates urging such varied theoretical models as cybernetics, depth of processing, parallel processing, long and short term/visual and verbal (Reiser 5/35-40, 1/9/81). See Kitestrom and Evans, **Functional Disorders of Memory** (1979); Loftus, **Memory** (1980) pp. 7, 15, 132. Moreover, as a method of obtaining historically accurate information, human recall

can be notoriously unreliable. See, e.g., Note, "Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification," 29 Stan. L. Rev. 969 (1977) and authorities collected in United States v. Wade, 388 U.S. 218, 228-29 n. 6 and 7, 87 S. Ct. 1926, 1933 n. 6 and 7 (1967).

Just as there is no scientific consensus concerning human recall in general, there is no generally accepted definition of hypnosis (Orne Tr. 1/18). Both Drs. Orne and Reiser agree that hypnosis is not a truth-detection device, is not sleep, and is not a way for the hypnotist to increase control over his hypnotic subject (Orne Tr. 1/21, 28/257-58, 296; Reiser Tr. 5/33, 45, 1/9/81). Dr. Orne, in describing hypnosis, emphasizes that it increases the subject's suggestibility and lowers his critical judgment.[6] (Orne Tr. 1/8, 22, 45, 50). He agrees, however, that hypnotic subjects, even when deeply hypnotized, can reject suggestions and need not be historically inaccurate about anything (Orne Tr. 228, 272-77, 299). He agrees that hypnotic subjects can distinguish hypnotic from non-hypnotic memories if properly cued (Orne Tr. 133, 171). He also agrees that hypnotic recall and non-hypnotic recall are subject to the same distorting process, e.g., sharpening of meaningful events, leveling out of inconsistencies, repeated verbalizing as encouragement of consistency rather than recall, suggestion, etc., but believes that they are likely to cause more distortion of hypnotic recall than of non-hypnotic recall (Orne Tr. 261-75). Dr. Reiser, in describing hypnosis, emphasizes that it increases the concentration, focus, and attention of the hypnotic subject (Reiser Tr. 5/26-29, 1/9/81). When proper demand characteristics or expectations are established, hypnotic subjects will respond with accurate and vivid recall of what they earlier perceived and will readily discriminate and distinguish memories, maintain their critical judgment, and reject suggestions (Reiser Tr. 5/41-46, 48-50, 58-60, 1/9/81).

The studies that have been conducted to date do not establish that hypnotic recall is any more historically inaccurate than non-hypnotic recall. Some studies by experimental psychologists show that hypnosis can increase the amount of recall for non-emotional, meaningful material by approximately 25% (Orne Tr. 151, 290-91), However, no experimental psychologist has yet finished an experiment which controls the amount of the increased number of things said under hypnosis and checks how many incorrect things were also said (Orne Tr. 292). The Putnam experiment, Putnam, "Hypnosis and Distortions in Eyewitness Memory," 27 IJEH 437 (1979), conducted to determine whether hypnotic subjects are more likely to answer leading questions incorrectly than non-hypnotic subjects and upon which Dr. Orne relies, in part, for his opinions concerning the problems of suggestivity in hypnosis (Orne Tr. 54), is of very limited usefulness because (i) it tests only for the effect of abuses in the use of hypnosis, i.e., leading questions, which should not occur in a properly conducted hypnotic session and (ii) its results, that hypnotic subjects did make more errors on leading questions which suggested incorrect answers than did non-hypnotic subjects, were obtained from an extremely small sample of non-random subjects: sixteen undergraduate students from a particular university all of whom had previously taken part in a hypnosis experiment and who were chosen for Putnam's experiment because their scores from a hypnotic susceptibility scale test were available. Indeed, such weaknesses occur in much of the work done by experimental psychologists in the field of hypnosis (Reiser, Tr. 5/44-45, 1/9/81). See Kerlinger, Foundations of Behavioral Research, pp. 127, 129, 309-311 (1973) ("A rough and ready rule taught to beginning students of research is: Use as large samples as possible ... the smaller the sample the larger the error. ... So-called 'accidental' sampling, the weakest form of sampling, is probably also the most frequent. In effect, one takes available samples at hand; classes of seniors in high school, sophomores in college, ..., and the like. This practice is hard to defend"). Dr. Reiser's results, on the other hand, are from a very large number (519) of people subjected to hypnosis in the "real world" context of criminal investigations. The

number 519 represents all of the hypnotic cases of the Los Angeles Police Department from June, 1975 to May, 1980. The results were as follows: Of the total 519 subjected to hypnosis, 80.6% (418) provided additional information not obtained before hypnosis. Of that 80.6%, approximately 50% (207) could have the historical accuracy of the additional information determined. Of that 50% group who provided additional information the accuracy of which could be determined, the study found an accuracy rate of 90.7% (187) and inaccuracy of 9.3% (19) (Reiser Tr. 5/15-20; 1/9/81). Such results suggest, at a minimum, that hypnotic recall is no less historically accurate than non-hypnotic recall, which is routinely admitted in criminal cases for the jury to hear and evaluate.

In two cases where Dr. Martin Orne testified and supplied the record as to the nature of hypnosis, the courts specifically rejected the argument that Frye precludes the admission of testimony elicited through hypnotically refreshed recall. In **United States v. Narciso,** 466 F.Supp. 252 (D. Mich. 1977), the court ruled that an elderly alcoholic patient at the Ann Arbor Veteran's Hospital would be permitted to testify as to his knowledge about the intravenously caused deaths of a number of patients, even though he had been hypnotized after stating that he had no memory of the events. The ruling came upon a pre-trial motion to suppress his testimony, after a hearing at which Dr. Orne testified regarding the nature of hypnosis and regarding his opinion that the patient's recall was the product of suggestion. The court stated:

> Particular care should be taken that the . . . matter is not removed for scientific examination out of context and by the application of scientific tests of validity vis a vis legal tests of credibility.

**Id.** at 282.

Similarly, in **State v. White,** an unreported decision of the trial court (No. J-3665, Milwaukee County Cir., March 27, 1979) also a case where Dr. Orne provided an opinion against the admissibility of evidence derived from a hypnotically refreshed recall, the court rejected the application of Frye's scientific reliability test, calling it a "procrustean rule". Stating that hypnosis is an accepted phenomenon, the court found that the issue was not whether hypnotic recall could be guaranteed as truthful. The court articulated that there are real conceptual problems in approaching hypnosis as parallel to the polygraph, and that the consequences of the Frye approach would be to discourage the important use of hypnosis. The question, according to the White court, is not whether the recall is truthful, per se, but whether the recall is based upon what the witness actually saw or experienced, as opposed to suggestion. Accord, **United States v. Adams,** 581 F.2d 193, 198 (9th Cir. 1978).

Spector and Foster, **supra,** also note the seriously erroneous equation of polygraph and hypnosis. At 584, they state:

> Unfortunately, hypnosis has become linked in the minds of courts and commentators with the polygraph and narcoanalysis as a technique for mechanically ascertaining the truth of the witness' testimony. Requiring hypnosis to perform a truth-determinant function, however, distorts the scientific process and aborts its potential benefit for litigation. The value of hypnosis lies in its scientifically established reliability as a device for retrieving relevant testimony previously forgotten or psychologically suppressed, regardless of the factual truth or falsity of that testimony. (Emphasis original.)

The court in **State v. McQueen,** 244 S.E.2d 414 (1978) also emphatically distinguishes the use of lie detector tests from hypnosis because of the truth-determined aspect of the former. The opinion makes it clear that the finding of the truth is the province of the jury.

While most courts hold that the Frye test is not applicable to hypnosis, a New Jersey Superior Court judge in the recent case of **State v. Hurd,** 173 N.J. Super. 353 (1980) applied a slightly different analysis and found that hypnosis met the Frye rule and that hypnotically refreshed memory was not per se inadmissible. The court stated:

> Acknowledgment of the inability of hypnosis to demonstrably generate "truth" does not, however, require a

determination that a witness who has submitted to a hypnotic exercise can never be allowed to testify to events which the witness could not recall prior to the hypnotic session. In light of the expert testimony and medical journals admitted in evidence in this case, we are satisfied medical research has established that, to varying degrees, a large portion of the population has the capacity to enter a hypnotic trance and that hypnotized subjects who are directed to do so have the ability to concentrate on a past event and volunteer previously unrevealed statements concerning the event. In this limited sense hypnosis has met the test imposed by **Frye.**

Only the recent case of **State v. Mack,** previously cited at 2 MSupp. 256 analyzes hypnosis under the **Frye** rule. See also, **State v. LaMountain,** 611 P.2d 551 (Arz. 1980) which concludes, with no analysis, that the state of the science or art of hypnosis is insufficient to admit testimony which may have been developed as a result of hypnosis. But here the testimony of Linda Dixon was not developed as a result of hypnosis. The **Mack** court relied heavily upon the testimony of Dr. Orne in reaching its conclusion. However, a closer examination of Dr. Orne's testimony in the instant case reveals that the evil to be avoided is not hypnosis, **per se,** but improperly conducted hypnotic sessions. See also Orne, "The Use and Misuse of Hypnosis in Court," 27 **The International Journal of Clinical and Experimental Hypnosis,** 311 (1979), ("IJCEH"). Moreover, as Dr. Martin Reiser's testimony makes clear, although hypnosis is not a truth-telling technique, properly conducted forensic hypnotic sessions do result in a high degree (90.7%) of historically accurate new information, at least as accurate as the live testimony from non-hypnotic subjects which juries and triers of fact hear and evaluate routinely.

On the basis of the foregoing, this court rejects the **Frye** analysis, as argued by the defendant, as being inapplicable to hypnosis.

The defendant further argues in favor of a **per se** exclusion of Linda Dixon's entire testimony on the theory put forth by Bernard L. Diamond that hypnosis alters a witness' memory irreversibly and therefore hypnotically influenced testimony is unreliable. (See note #5.) Dr. Diamond is the only advocate of a blanket exclusion of previously hypnotized witnesses' testimony on the ground of incompetency. See Diamond, "Inherent Problems in the Use of Pre-trial Hypnosis on a Prospective Witness," 68 Calif. L. Rev. 313 (1980). Diamond claims that a previously hypnotized witness is incompetent to testify because (1) he will confound, or mix up, his hypnotic memory of events with his pre- and post-hypnotic waking memories and, indeed, will be convinced that his hypnotic memory is an accurate and true account of the events, (2) he will fantasize, or confabulate, while hypnotized and, after hypnosis, not be able to separate his fabrications from true recall; and (3) he will, after hypnosis, be subjectively certain of the accuracy and truth of his hypnotic memory whereas before hypnosis he was willing to express some uncertainty.

In **People v. Diggs,** the California Court of Appeals, 28 Crim. L. Rep. 2372, on November 25, 1980, held that it was not error to admit in evidence the testimony of a witness interviewed under hypnosis prior to trial, **notwithstanding the testimony of Dr. Diamond to the contrary,** holding that the lower court was presented with sufficient evidence of the reliability of the method used, the competence of the hypnologist, the correctness of his procedures and the relative absence of post-hypnotic suggestion.

The testimony adduced during the hearing on the defendant's motion to suppress and the literature published concerning hypnosis reveal that, while such problems can occur, they can in fact be safeguarded against by appropriate procedures.

Hypnotic recall is subject to the same weaknesses as non-hypnotic recall, including distortion due to suggestion and confabulation, i.e., a tendency to fill in gaps (Orne Tr. 259-72; Reiser Tr. 43, 1/9/81). See Note, **Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identifica-**

tion, 29 Stan. L. Rev. 969 (1977). Contrary to Diamond's claim, experimental psychologists recognize that hypnotic subjects can discriminate among their hypnotic and non-hypnotic memories if properly cued by the hypnotist (Orne Tr. 171). See Orne, The Use and Misuse of Hypnosis in Court, IJCEH, Vol. 29, No. 4 (1979), p. 320. The data and experience of forensic hypnotists strongly indicate that with proper demand characteristics established and proper questioning by the hypnotist, hypnotic subjects can distinguish hypnotic and non-hypnotic memories, recall events with a high degree (90.7%) of historical accuracy, and not have their subjective certainty or critical judgment altered (Reiser Tr. 15-16, 28-32, 41, 43-44, 46, 48-50, 1/9/81). Diamond's own article contains equivocal words such as "may" and "often" and with examples of obvious and avoidable abuses in the hypnotic process. The testimony of Dr. Reiser as well as the literature in the field of hypnosis establishes convincingly that hypnosis does not per se render a witness incompetent to testify. See generally, Spector and Foster, The Utility of Hypno-Induced Statements in the Trial Process: Reflections on People v. Smrekar, 10 Loyola Univ. L. Journal 691.

Blanket rules of incompetency which prevent whole classes of witnesses from testifying are disfavored. See, Commonwealth v. Whitehead, Mass. Adv. Sh. (1980) 257, 272, 400 N.E.2d 821, 833-34, ("The tendency, moreover, except in quite clear cases of incompetency, is to let the witness testify and have the triers make any proper discount for the quality of her 'understanding' . . . [even in a case where] the proffered testimony could be thought crucial"). Similarly, whether a particular hypnotic session has rendered a witness incompetent to testify depends upon the degree of impropriety of the procedures used, and even an improperly conducted hypnotic session may have no effect upon the hypnotic subject's ability to separate memories, recall accurately what he initially perceived, or express varying degrees of certainty. Cf. Orne, "The Use and Misuse of Hypnosis in Court", IJCEH, Vol. 27,

4, p. 318.

Because hypnosis can affect people in different ways, depending on the individual and the particular procedures used, this court rejects a blanket rule of incompetency of previously hypnotized witnesses as argued by the defendant.

G.L. c. 233, § 20 provides, in relevant part:

> Any person of sufficient understanding
> . . . may testify in any proceeding, civil
> or criminal . . .

"The standard governing the competency of witnesses is clear. A witness is competent to testify if he or she is aware of a duty to tell the truth and has personal knowledge of relevant facts. Competency also depends on the capacity of a witness to perceive, remember, and recount his or her knowledge of the facts." Commonwealth v. Gibbons, Mass. Adv. Sh. (1979) 2168, 2172, 393 N.E.2d 400, 403; see, Commonwealth v. Tatisos, 238 Mass. 322, 325, 130 N.E. 495, 497 (1921); Mass. Proposed Rules of Evidence 601 and 602. The issue of competency is solely for the trial judge to determine in his sound discretion and only a clear abuse of that discretion warrants reversal. Commonwealth v. Whitehead, Mass. Adv. Sh. (1980) 257, 273, 400 N.E.2d 821, 833; Commonwealth v. Sires, 370 Mass. 541, 546, 350 N.E.2d 460, 464 (1976). That a witness may have weaknesses, even severe ones, affecting his or her capacity to perceive, remember, and recount does not establish incompetency. Thus, in Commonwealth v. Festa, 369 Mass. 419, 424-25, 341 N.E.2d 276, 280 (1976), the Supreme Judicial Court held that a witness' extreme age (88 years old), her inability to relate the substance of what she heard, and her having taken pain-relieving medication on the evening of the event she related affected the weight, not the admissibility, of her testimony. In Commonwealth v. Sires, supra, the Court found no abuse of discretion in admitting the testimony of a witness who "had recently been institutionalized for alcoholism and had been under medication for hallucinations and loss of memory". Similarly, in Malchanoff v. Truehart, 354 Mass. 118, 120-22, 236

N.E.2d 89 (1968), the Court found "ample evidence of an eight year old's competency to testify about events which occurred when she was three and further held that she had sufficient knowledge to testify about the event because her testimony, based on her personal experience, was not "inherently impossible or so fantastic that no rational person could believe it". See Commonwealth v. Whitehead, supra at 274, 400 N.E.2d at 834.

In the instant case, Linda Dixon had sufficient ability to remember and recount events which she perceived on October 29 and 30, 1979 and some weeks later, that her testimony at the voir dire hearing was not based on her memory being revived by hypnosis and that she could distinguish between what she said to the police prior to the hypnotic session as well as what she said under hypnosis.

In late October, 1979, Dixon was a 17-year old college student. She regularly wore contact lenses for nearsightedness, but could identify someone up to ten feet away from her without aid of the lenses. At that time, she also regularly used cocaine (by snorting it), "dex", an amphetamine (ingested it once or twice a week), and marijuana (smoked it almost every day). She has, for several years, taken medication for an epileptic condition; the medication does not make her drowsy or cause any other notice-able side effect. On the evening of October 29-30, 1979, Dixon drank three to four beers over a period of several hours before proceeding to the defendant's apartment with the defendant, Sherry Famiglietti, and a man named Ron. Famiglietti testified that, after the defendant and Ron left the apartment, she and Dixon smoked a joint of marijuana; Dixon specifically remembers not smoking that day. See, Commonwealth v. LaCorte, 373 Mass. 700, 706, 369 N.E. 2d 1006 (1977) (witness' drug addiction subject to extensive cross-examination); Commonwealth v. Caine, 366 Mass. 366, 318 N.E.2d 901, 905 (1974) (proof of mental impairment, habitual intoxication and drug addiction permitted to impeach if shown to affect capacity to perceive, remember and recount); Commonwealth v. Festa, 369 Mass. 419, 341 N.E.2d 276

(1976). Famiglietti testified that, although Dixon appeared to be "feeling good", slur-ring her words and swaying a little, she was not so inebriated or drugged that she needed any assistance walking or could not carry on a conversation in a coherent fashion. Famiglietti left at approximately 4:00 a.m.; no evidence suggests that Dixon ingested any more alcoholic or narcotic substances while she waited for the defendant to return to his apartment. After seeing the defendant return at approximately 5:00 a.m. with some blood on him, Dixon took some cocaine intravenously; her reaction to the cocaine was not as strong as she had expected. Throughout the evening, the light in the defendant's apartment was dim but objects in the apartment were clearly dis-cernible. All the evidence indicates that Dixon had the ability to perceive the events of October 29 and 30, 1979 as she described them and in fact was testifying from her personal knowledge. The evidence supports the same conclusion concerning Dixon's ability to perceive and testify about the defendant's subsequent "alibi" conversation with her at Father's Five, despite her hav-ing drunk "quite a few" strong drinks at the time (Dixon, 1/7/81). Cf., Commonwealth v. Stewart, 359 Mass. 671, 674-75, 270 N.E.2d 811, 813-14 (1971), vacated in part (death penalty) sub nom. Stewart v. Massachusetts, 408 U.S. 845, 92 S. Ct. 2845 (1972) (defendant testifies as to events although he had a long history of being a heavy drinker and user of amphetamines and, on the date of the shootings, had drunk beer and brandy almost continually from morning to 5:00 p.m.).

Whether Dixon had sufficient ability to remember the events she related on the stand to be declared competent to testify at trial is an issue to be decided solely by the trial judge based upon his observations of her demeanor and upon evidence intro-duced (see, Commonwealth v. Fillippini, 2 Mass. App. 179, 189, 310 N.E.2d 147, 153 (1974)), concerning the effect, if any, the hypnotic session may have had upon her memory. See, Commonwealth v. Pearsall, 370 Mass. 413, 415, 348 N.E.2d 428, 430 (1976) (four-year-old competent to testify); Malchanoff v. Truehart, supra

(strike testimony of eight-year-old about events when she was three years old if it falls short of personal knowledge requirement).

A review of the testimony concerning Linda Dixon's statements before, during, and after hypnosis reveals that she told the same basic story on three occasions to the police prior to hypnosis with varying amounts of cumulative detail. Her statements made while under hypnosis were elicited by a range of questions which, taken as a whole, were well within acceptable professional standards and the vast majority of which were completely non-leading and not impermissibly suggestive (Reiser, Tr. 5/57-70, 1/9/81). She testified that she could recall and discriminate those of her statements made before, during, and after hypnosis (Dixon 1/5 – 7/81). She revealed herself to be a candid and intelligent witness. Her testimony and demeanor on the stand clearly demonstrated that, regardless of the propriety of the hypnotic session, she was remembering the events she was relating from sufficient original memory to meet witness competency standards and not from a memory "created" for her by others during hypnosis. For example, she testified that, although she knew she had said under hypnosis that she had drunk fourteen gin and tonics when the defendant approached her about her being his alibi, she could presently state only that she had had "quite a few" such drinks. She candidly admitted that she was presently not sure whether the defendant had blood on his hand when he returned to his apartment in the early hours of October 30, 1979. These statements, like the rest of Linda Dixon's testimony before this court, and her demeanor on the stand, reveal that she is attempting and succeeding to remember and recount the events she described from original memory. Her refusal, despite pressure from defense counsel during cross-examination, to adopt certain statements she made under hypnosis, e.g., fourteen gin and tonics, blood on the hand, shows that she was not "reciting a superimposed memory". Contrast State v. Hurd, 173 N.J. Super. 333, 348 (1980). Fairly stated, Linda Dixon's current memory of events shows the normal mix of sharp memory and dull memory, specific and general, which everyone has. For instance, she lacks a specific memory of such habitual events as getting up in the morning and going to class but she does specifically remember having lunch on October 29, 1979 because she charged it. Her testimony reveals that her current memory of events is undergoing the same processes of leveling and sharpening as the memory of a person who has not been subjected to hypnosis undergoes. Moreover, she is capable now, after hypnosis, of expressing uncertainty about some points she made during hypnosis. This capability shows that, contrary to Dr. Orne's belief concerning the effect of hypnosis on memory, the hypnotic session did not "create a memory" which Linda Dixon is now substituting for her recall of the original events and to which she is willing to cling to with great subjective certainty as to its "truth". Her testimony and demeanor convincingly demonstrate her ability to remember the original events she related from present memory. Accordingly, this court finds Linda Dixon competent to testify

The defendant argues further that strict procedural safeguards should be required for the admissibility of hypnotically influenced testimony and urges the court to adopt the procedural safeguards derived from Dr. Orne's testimony in State v. Hurd, 173 N.J. Super. 353, 362-363 (1980).[7]

As previously stated, this is not a case where a witness' testimony is based solely on her memory being revived by hypnosis since Linda Dixon's voir dire testimony had the independent support of her three statements given to the police on February 1, 1980 prior to hypnosis. But in ruling on the issue of whether the hypnotically induced statement of Linda Dixon has sufficient reliability to justify its introduction in evidence, or other use, if required, to refresh her recollection at trial, the court makes the following finding of facts concerning the reliability of her statement under hypnosis and the procedures that were followed in obtaining her statement on the issue of whether the procedures used were so suggestive as to create a likelihood that her

testimony is tained by an irreparably altered memory.

The crux of the defendant's claim is that the hypnotic procedures used with Linda Dixon were so suggestive as to alter her memory and because Drs. Orne, Reiser, and Alexander all agree that problems of suggestion can arise in an improperly conducted hypnotic session, the constitutional principles developed in **Simmons v. United States**, 390 U.S. 377, 88 S.Ct. 967 (1968), **Stovall v. Denno**, 388 U.S. 293, 87 S. Ct. 1967 (1967), and **United States v. Wade**, 388 U.S. 218, 87 S. Ct. 1926 (1967) concerning the suggestiveness of certain pre-trial identification procedures are relevat and helpful in determining the admissibility of Linda Dixon's in-court testimony. Indeed, the well established **Simmons** standard of suppression — "only if the . . . procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," id. at 384, 88 S. Ct. at 381 — has been adopted in other jurisdictions as a test for determining the admissibility of testimony from a previously hypnotized witness. See, **United States v. Narciso**, 446 F.Supp. 252 (E.D. Mich. 1977); **People v. Smrekar** 68 Ill. App. 3d 379 (1979); **People v. Hughes**, 99 Misc.2d 863 (N.Y. 1979); **State v. Hurd**, 173 N.J. Super. 333 (1980); **State v. White**, supra.

In **Simmons v. United States**, 390 U.S. 377, 383-84, 88 S. Ct. 967, 971 (1968), the Supreme Court described the dangers of an unduly suggestive identification procedure: "Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph [of the accused shown to the witness in an unduly suggestive manner] rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identifications." These concerns echo those expressed by the expert witnesses in the instant case. All three experts agreed that a misuse of the hypnotic process can result in the hypnotic subject's retaining in his memory only a "created" hypnotic recall of events rather than a reproduction or refreshment of what he originally perceived. The

Supreme Court's concerns expressed in **United States v. Wade**, 388 U.S. 218, 229, 87 S. Ct. 1926, 1933 (1967) — that "[s]uggestion can be created in many subtle ways. And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest. Moreover, . . . once a witness has picked out the accused . . . he is not likely to go back on his word later on" — are similarly applicable to potential abuses of the hypnotic process. Under a **Simmons-Wade** analysis, the evil to be prevented with respect to hypnosis is undue governmental suggestion, whether intentional or non-intentional. If a witness' recall is inaccurate due to the foibles of human recall and not due to impermissible governmental suggestion, then there is no reason for exclusion.

Much of the expert testimony presented in the hearing on the defendant's motion to suppress concerned the procedural safeguards needed to ensure a properly conducted hypnotic session. Other jurisdictions have adopted or recommended safeguards of varying degrees of strictness. See, **United States v. Adams**, 581 F.2d 193, 199 n. 12 (9th Cir.), cert. denied, 439 U.S. 10006 (1978); **State v. Hurd**, 173 N.J. Super. 333, 363 (1980); Ault, "F.B.I. Guidelines for the Use of Hypnosis," 27 IJCEH 449 (1979); **Commonwealth v. A Juvenile**, Mass. Adv. Sh. (1980) 2319, 2324 n. 8, 412 N.E.2d 2319, 2324 n. 8 (collected authority).

A **Simmons** type analysis requires that each case be judged on its own facts and a determination concerning the suggestiveness of a particular hypnotic session be made only after reviewing "the totality of surrounding circumstances" **Simmons v. United States**, supra at 383, 88 S. Ct. at 970. See, **Stovall v. Denno**, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972 (1967). The Commonwealth suggests that the factors to be considered in evaluating the likelihood that Linda Dixon's testimony has been tainted by hypnotic procedures so unduly suggestive that her memory has been irreparably altered include: (a) the need for the witness to be hypnotized, (b) the qual-

ifications of the hypnotist, (c) the motivations and character of the witness, and (d) the manner in which the hypnotic session was conducted.

(a) **The need for the witness to be hypnotized.** Although not strictly a factor in determining whether a particular pretrial procedure was impermissibly suggestive, the need for such procedure was an issue described in **Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972 (1967)** and is appropriately discussed here. Hypnosis is not an investigative technique to be used routinely. Ordinarily, it is used only when it serves a particular, identified purpose and when normal investigative procedures have been exhausted; hypnosis is not a substitute for good investigatory work (Reiser Tr. 74). Ordinarily, therefore, the hypnotic session will take place some days, weeks, or months after the criminal incident, when the criminal investigation has bogged down or come to a dead end (Reiser Tr. 5/40. 74). Obviously, the need should be judged on the basis of circumstances at the time the decision to use hypnosis is made and not on the basis of hindsight or on the basis of what results were actually achieved by using hypnosis.

(b) **The qualifications of the hypnotist.** All three experts agree that the hypnotist should be well trained in the use of hypnosis. Dr. Orne believes, however, that the hypnotist must be a licensed psychologist or psychiatrist (Orne Tr. 328). See, Amicus Curiae Affidavit of Dr. Orne submitted in **Quaglino v. California, U.S. Sup. Ct. No. 77-1288, cert. den. 11/27/78, p. 25** (hereinafter "Quaglino affidavit") (Exhibit #8). Drs. Reiser and Alexander vehemently disagree, correctly pointing out that hypnotism should be used only in the field in which the hypnotist is trained to perform without hypnotism. Thus, for example, dentists should not use hypnosis to psychoanalyze their patients. Similarly, psychiatrists and psychologists should not use hypnosis to investigate crimes because they are not trained in the field of criminal investigation. Both Reiser and Alexander agree that Detective Brady is a qualified forensic hypnologist. Hypnosis is no more than a tool one may use to accomplish a

given task; it does not, of itself, confer the knowledge or insight needed to accomplish the task. (Reiser Tr. 71-76, 1/9/81; Alexander 1/6/81). Accordingly, the best qualified person to perform hypnosis for purposes of eliciting accurate recall of events relevant to a criminal investigation is someone trained in both criminal investigation and hypnosis. Interestingly, Dr. Orne, in his 1979 article on hypnosis in the courtroom, would agree:

... psychologists and psychiatrists are not particularly adept at recognizing deception ... and ... appropriately do not concern ourselves with this issue since in most therapeutic contexts it is helpful for the therapist to see the world through the patient's eyes ...

As a rule, the average hotel credit manager is considerably more adept at recognizing deception that we are ... only a few colleagues who are experienced in the use of hypnosis had this type of background ... it is essential that those of us who have an interest in these matters develop the necessary sophistication and judgment in the forensic context. It would be focihardy indeed to assume that familiarity with one context is sufficient to allow us to function effectively in the other." Orne, "The Use and Misuse of Hypnosis in Court," 27 IJCEH at 334-35 (1979).

All three experts agree that the hypnotist should be "independent." However, Dr. Orne believes that independence can be achieved only when the hypnotist is not a salaried employee of the police department. See, **Quaglino** affidavit p. 25 (Exhibit #8). Such a mechanistic requirement would exclude police officers as a class from performing hypnosis, although they are obviously the best qualified individuals to undertake it in the forensic context, and would not at all insure "ethical independence" (Alexander 1/6/81). Indeed, an "independent" hypnotist, as defined by Dr. Orne, whose services would be contracted for on a by-the-session basis may well feel more pressured to obtain results he thinks his client wants than a salaried employee because the former may believe that only the production of certain results in a given

session will assure that he will be rehired, as an independent contractor, for subsequent cases (Reiser 1/9/81). Drs. Reiser and Alexander correctly point out that the ethical independence and sense of professionalism of the individual hypnotist is the appropriate field of inquiry. ..

(c) **The motivation and character of the hypnotic subject.** Just as the hypnotist should be ethically independent, the hypnotic subject should not have "a hidden agenda" or "an axe to grind" (Reiser Tr. 5/33, 84, 1/9/81) that would motivate the subject to lie or distort. Hence, a judge might receive the testimony of a previously hypnotized spouse of a criminal defendant, who has every desire to exonerate the defendant, with more caution than that of a previously hypnotized eye-witness to an event who has no other known connection to the case. Moreover, the motion judge should weigh the hypnotic subject's general intelligence and normal recall abilities in making his determination because those factors influence a hypnotic subject's ability to differentiate hypnotic from non-hypnotic memories (Alexander 1/6/81; Reiser Tr. 5/4-50, 87).

(d) **The manner in which the hypnotic session was conducted.** Procedural safeguards mandating that hypnotic sessions be conducted in a particular fashion can serve two distinct purposes in a criminal case: (1) they can ensure, at some minimum, a constitutionally permissible level, that the hypnotic session was not so unduly suggestive that it created the substantial likelihood of an irreparably altered memory, and (2) they can ensure a minimally acceptable ability to reconstruct the actual procedures used in a given case, see, United States v. Adams, 51 F.2d 193, 199 n. 12 (1978). It is this Court's opinion that the defendant's insistence upon overly rigid requirements reveals his basic misconceptions about these purposes.

As when the issue is the alleged suggestiveness of pretrial identification procedures, the goal of procedural safeguards for hypnotic sessions does not require "extirpation of all appearances of doubt. The goal is to enure that the accused receives a fair trial by not being exposed to [testimony] which is inherently unreliable or which derives from governmental misconduct." Commonwealth v. Jones Mass. App. Adv. Sh. (1980) 123, 399 N.E.2d 1081, 1087. Once the Court determines that the prohibited line of substantial likelihood of irreparably altered memory has not been crossed, the witness' testimony should be passed to the jury for their evaluation of its weight and credibility. See, Commonwealth v. Coy, Mass. App. Adv. Sh. (1980) 1539, 1548, 407 N.E.2d 1310, 1314. Indeed, "evidence with some element of untrustworthiness is customary grist for the jury mill." Manson v. Brathwaite, 432 U.S. 98, 117, 97 S. Ct. 2243, 2254 (1977). See, Commonwealth v. Gilday, 367 Mass. 474, 495, 327 N.E.2d 851, 864 (1975) (absent constitutional defects, witness' identification testimony is for the jury, despite inherent weaknesses). Thus, safeguards for hypnotic inductions which accomplish more than assuring this minimum level of reliability, while desirable, are not mandatory in the sense that failure to meet them in each and every instance should require suppression of the previously hypnotized subject's testimony. As is true concerning motions to suppress other pre-trial procedures claimed to be unduly suggestive a judge ruling on a motion to suppress testimony of a previously hypnotized witness must decide the issue on the basis of the overall quality of the procedures surrounding the hypnotic session. See, Simmons v. United States, 390 U.S. 377, 385-86, 88 S. Ct. 967, 972 (1968) (photographic identification not unduly suggestive "although the identification procedure employed may have in some respects fallen short of the ideal"); Commonwealth v. Clifford 374 Mass. 293, 304, 372 N.E.2d 1267, 1275 (1978) (in light of overall makeup of the lineup, the defendant was not impermissibly singled out for wearing a jacket similar to the one used during the crime; hence the lineup was not unduly suggestive).

All three experts agree that the hypnotist should at all times, i.e., before, during, and after hypnosis, (i) avoid cueing the hypnotic subject to confound his waking memories with his hypnotic memories or to believe

that he will, under hypnosis, recall the "truth" as opposed to his perceptions and (ii) avoid using leading questions or exposing the subject to information not elicited from the subject. Dr. Orne further believes that, before hypnotizing the subject, the hypnotist should "elicit a detailed description of the facts as the witness . . . remembers them" Quaglino affidavit p. 26 (Exhibit #8). Drs. Reiser and Alexander point out, however, that such a procedure can introduce a whole new set of interactions between the hypnotist and subject and can increase the chance of improper cueing and suggestive leading questions. (Reiser Tr. 105-07 1/9/81; Alexander 1/6/81). For that reason, the chief investigating officer should not be the hypnotist (Reiser 1/9/81). Drs. Reiser and Alexander's position that the hypnotist should know as little as possible, only the core facts, about a given case, appears to be the better safeguard against undue suggestion (Reiser Tr. 77-82; Alexander 1/6/81). Dr. Orne also believes that only the hypnotist and the subject should be in the room during the hypnotic session. Both Drs. Reiser and Alexander find this requirement much too rigid. Subjects hypnotized to recall the facial characteristics of a criminal must work with a police artist. The police officer in charge of a given criminal investigation or a prosecutor assigned to the case can aid the hypnotist by informing him which topics need to be covered. The presence of another woman in the room can have a calming, reassuring influence upon a female hypnotic subject (Reiser Tr. 81-82, 122, 1/9/81; Alexander 1/6/81). Thus, the presence of other people may not only not harm a hypnotic session but may be necessary. What is to be avoided is not the presence of other people, per se, but improper cueing and the creation of a "circus atmosphere." (Reiser Tr. 5/122).

Concerning the second purpose for which procedural safeguards can serve — that they ensure some minimally acceptable ability to reconstruct the actual procedures used in a given case — all the experts agree that an accurate record of the interactions between the hypnotic subject and the hypnotist and any other police officers is desirable in order to determine whether any impropriety occurred and what influence, if any, it had on the subject. Differences of opinion lie in deciding what procedures are minimally required to assure an adequate examination of the issue. Dr. Orne would require: (1) tape recordings of all interactions between the hypnotic subject and the police which preceded the hypnotic session, (ii) a written memorandum of what information the hypnotist has been given about the case and (iii) a videotape of all contact, i.e. before, during, and after the hypnotic sessionn, of the hypnotist with the hypnotic subject. See, Quaglino affidavit pp. 25-27 (Exhibit #8). The Court finds that such rigid requirements are unrealistic and unnecessary.

Preliminarily, police officers interact with individuals who may later be hypnotized in a variety of circumstances, e.g., at the scene of a crime, during an emergency, unexpectedly on the street; tape recordings of such interactions are not possible and may in fact hinder the officers' performance of other duties. The recording expenses alone of taping all interactions and videotaping al hypnotist-subject contacts can be prohibitive (Reiser 1/9/81). Such procedures are therefore impractical and in some instances, impossible to implement.

More importantly, the rigid procedural requirements which the defendant urges upon this Court to employ in assessing the suggestiveness of a hypnotic session also reveal an unwarranted mistrust of human memory in general and police officers' memories in particular (see Orne Tr. 191, 243). A hearing on a motion to suppress is not a scientific laboratory where experiments are conducted with the rigorous control necessary for the results to comply with scientific standards of proof, validity, and empirical replicability. Its purpose is not to arrive at an "absolutely certain" result (Orne, Tr. 244). Case law recognizes the difficulty of reconstructing pre-trial identification procedures such as lineups. See, e.g., United States v. Wade, 388 U.S. 218, 230-36, 87 S. Ct. 1926, 1934-37 (1967). However, constitutional due process does not require videotape recordings of lineups, much less audio recordings of all

contacts between police and witnesses before and after lineups, in order to ensure their full and accurate reconstruction during hearings on motions to suppress. Indeed, the Supreme Court has only gone so far as to require, under the Sixth Amendment's right to counsel, that defense counsel be present at post-indictment lineups. **United States v. Wade,** 388 U.S. 218, 87 S. Ct. 1926 (1967). See, **Kirby v. Illinois,** 406 U.S. 682, 691, 92 S. Ct. 1877, 1882-83 (1972) (Sixth Amendment does not require the presence of counsel at a post-arrest, pre-indictment show-up). Neither due process nor Sixth Amendment considerations require different standards for hypnotic sessions.

The defendant's insistence upon preexisting "hard" evidence, e.g., written memoranda, video and audio tapes, as a matter of right, reveals his apparent misconception about the function of a hearing on a motion to suppress. The purpose of such a proceeding is not only to decide whether testimony should be admitted or suppressed but also to make a record upon which that decision is based. See, generally **Commonwealth v. Moynihan,** Mass. Adv. Sh. (1978) 2654, 2663, 381 N.E.2d 575, 578-79; **Commonwealth v. Cincotta,** Mass. App. Adv. Sh. (1979) 73, 77 n. 1, 384 N.E.2d 1244, 1247 n. 1, **affirmed,** Mass. Adv. Sh. (1979) 2671, 398 N.E.2d 478 (findings of fact supported by evidence presented during hearing on motion to suppress highly desirable). By far the largest component of evidence presented in hearings on motions to suppress is live testimony. Not only can the Court reconstruct events from live testimony but such testimony can often clarify a point which may appear ambiguous in a written exhibit. For example, Linda Dixon's live testimony before the Court concerning her reference during the hypnotic session to her contact lenses clarified an admittedly ambiguous statement in the transcript of the session (See, Reiser Tr. 66-67: difficult to interpret the reference because the context is unclear within the four corners of the transcript). Live testimony may also be more helpful to the Court than documentary evidence in determining a witness' subjective understanding, e.g., Linda Dixon's subjective understanding of hypnosis and its affect on her. See generally, **Commonwealth v. Jones,** Mass. App. Adv. Sh. (1980) 123, 127-30, 399 N.E.2d 1081, 1084-86 (relationship between evaluation of live testimony and findings of fact).

In the instant case, in terms of "hard" evidence about the hypnotic session, this Court has before it (a) a transcript and tape recording of the hypnotic session, although the recording ends abruptly near the conclusion of the session allegedly due to the plug accidentally falling out of the socket (b) the police report given Detective Brady, and (c) Detective Chaisson's written report of Linda Dixon's statements to him made prior to her being hypnotized, which report was written shortly after the hypnotic session from notes taken contemporaneously with Dixon's pre-hypnotic interview and which report contains, in two separate paragraphs, information elicited from Linda Dixon during hypnosis. The Court also has before it extensive live testimony from several witnesses about (a) Linda Dixon's interviews with police before hypnosis, (b) what Detective Brady knew about the criminal investigation and Linda Dixon before he met her, (c) what Detective Brady told Dixon in the pre- and post-induction interviews, and (d) what occurred during the hypnotic session, including events which occurred after the tape recorder stopped recording. All of the above evidence provides a more than adequate basis for this Court to render a decision.

On the issue of whether or not Linda Dixon's in-court testimony should be suppressed because of its unreliability as not having a source independent of the hypnotic session, the Court is aware that other jurisdictions have employed the "reliability" test of **Neil v. Biggers,** 409 U.S. 183, 200, 93 S. Ct. 375, 382 (1972) and **Manson v. Brathwaite,** 432 U.S. 98, 115, 97 S. Ct. 2243, 2253 (1977), and the "independent source" test of **United States v. Wade,** 388 U.S. 218, 240, 87 S. Ct. 1926, 1939 (1967) in determining whether to admit testimony of a previously hypnotized witness. See, **State v. Hurd,** 173 N.J. Super. 333, 362 (1980) (reliability test); **Merri-**

field v. State, ____ Ind. ____ 400 N.E.2d 146, 149-50 (1980) (independent source).

In **Commonwealth v. A. Juvenile**, Mass. Adv. Sh. (1980) 2319 2325 n. 10, 412 N.E.2d 339, 343 n. 10, the Supreme Judicial Court left open the issue of whether such tests were relevant in determining the admissibility of hypnotically aided testimony by noting:

> A suggestive pre-trial identification may or may not bar the admission of testimony based on observations made at the time of the crime. See **Manson v. Brathwaite**, 432 U.S. 98 (1977); **Neil v. Biggers**, 409 U.S. 188 (1972). On the other hand, testimony based solely on "memory" revived by hypnosis has no independent support from the witness.

The instant case is not one of "testimony based solely on 'memory' revived by hypnosis." Indeed, the Supreme Judicial Court's definition of "hypnotically aided testimony" as "testimony that was not available from the hypnotized witness before hypnosis and became available from that witness after hypnosis," id. at 2320 n. 3, 412 N.E.2d at 341 n. 3, may not meaningfully describe Linda Dixon's testimony. See, **Merrifield v. State**, supra. A comparison of Linda Dixon's pre-hypnotic statements with those she made during hypnosis shows that, the only additional information that she provided while under hypnosis was that the defendant's trousers were torn and he had some blood on his neck when he returned to his apartment on October 30, 1979, and that "Dale" was the name of the man she was with when the defendant approached her about his alibi. This information was merely cumulative of that already obtained from her before hypnosis.

Under the reliability test of **Neil v. Biggers**, 409 U.S. 183, 200, 93 S.Ct. 375, 382 (1972) and **Manson v. Brathwaite**, 432 U.S. 98, 115, 97 S. Ct. 2243, 2253 (1977) evidence of a suggestive pre-trial identification is admissible if, under the totality of the circumstances, the identification was reliable, and, in determining such reliability, courts should examine five factors: (1) the opportunity of the witness to perceive the incident, (2) the degree of attention of the witness, (3) the accuracy of the witness' prior descriptions, (4) the witness' level of certainty demonstrated during the suggestive pre-trial procedure, (5) the length of time between the crime and the pre-trial procedure — and weigh those factors against the corrupting influence of the suggestive pre-trial procedure.

Under the independent source test, in-court testimony is admissible if it has a source independent of an unduly suggestive pre-trial procedure, and, in determining that issue, courts have considered the following factors: (1) prior opportunity to observe the event, (2) prior errors in description whether of omission or commission, (3) the receipt of other suggestions, and (4) the lapse of time between the event and the suggestive pre-trial procedure. See, **United States v. Wade**, 388 U.S. 218, 241, 87 S. Ct. 1926, 1940 (1967); **Commonwealth v. Botelho**, 369 Mass. 860, 868, 343 N.E.2d 876, 882 (1976).

The evidence relevant to the reliability test is substantially the same as the evidence relevant to the independent source test, see, **Commonwealth v. Botelho**, supra at 872 n. 11, 343 N.E.2d 876, 883 n. 11, and trial courts have been directed to make findings emphasizing the factors and issues set out by the tests, see **Commonwealth v. Cincotta**, Mass. App. Ct. Adv. Sh. (1979) 73, 77 n. 11, 384 N.E.2d 1244, 1247 n. 1, affirmed, Mass. Adv. Sh. (1979) 2671, 398 N.E.2d 478.[8]

Before considering the evidence under the reliability test and the independent source test, the Court feels that it is appropriate at this time to discuss the issue of corroborative evidence.

As the term is used in **Neil v. Biggers**, supra at 195 and 201, 93 S.Ct. at 380 and 382, corroborative evidence means evidence of the witness's consistent statements or descriptions given before the challenge pre-trial procedure. As Dr. Orne uses the term, it means from a source different from or independent of the witness which establishes the historical accuracy of each and every bit of information elicited from the witness while hypnotized. To make production of the latter independent evidence a precondition to the admissibility of live

testimony from a previously hypnotized witness goes too far. First, no other evidence may exist. Second, as a practical matter, the Commonwealth and the defendant would have to try the entire case before the motion judge. Third, a requirement of such stringency once again goes beyond the proper purposes of a motion to suppress. No human recall, hypnotic or non-hypnotic, is necessarily historically accurate. Independent evidence corroborating human recall is as important to assure the historical accuracy of non-hypnotic recall as it is of hypnotic recall (Reiser Tr. 45). However, courts do not require independent corroboration of non-hypnotic recall. The legal standard of admissibility of live testimony concerning an event is far lower than either scientific or legal standards of proof that the event occurred (see discussion infra). Finally, although other jurisdictions have included independent evidence as a factor in their determinations that testimony of previously hypnotized witnesses is admissible, see, Harding v. State, 246 A.2d 302, 312 (Md. 1968), People v. Smrekar, 385 N.E.2d 848, 854-55 (Ill. App. 1979), such analysis, to the extent it makes independent evidence a requirement for admissibility, may be unsound. In Manson v. Brathwaite, supra at 117, 97 S. Ct. at 2254, the Supreme Court noted the existence of independent evidence but was careful to state that "it plays no part in our analysis." As Justice Stevens points out in his concurring opinion, Manson v. Brathwaite, supra at 119, 97 S. Ct. at 2255, "in evaluating the admissibility of particular identification testimony it is sometimes difficult to put other evidence of guilt entirely to one side [but the Court's Opinion] carefully avoids this pitfall and correctly relies only on appropriate indicia of the reliability of the identification itself." This Court believes this statement to be the better view. However, if this Court should decide to include corroborative evidence as a factor in determining the admissibility of Linda Dixon's testimony, the Commonwealth asserts that Dixon's statements to police made before she was hypnotized and the interview by Detective Chaisson with the man Dixon called Dale adequately

corroborated her statements made while hypnotized.

Concerning the previously described factors of the reliability and independent origin tests, the evidence relevant to them is similar to that already discussed with respect to Linda Dixon's competency to testify (See discussion supra pp. 22-30). Indeed, the main difference may be the standard of proof required: competency has a judicial-discretion-based-on-the-evidence standard while the constitutional tests require clear and convincing evidence.

Without repeating in detail the evidence previously discussed with respect to competency, the court finds that the Commonwealth has proven by clear and convincing evidence that Linda Dixon's live testimony is reliable and has a source independent of the hypnotic interview of February 1, 1980 and cites the following reasons for its conclusion:[9]

(a) Linda Dixon had ample opportunity to observe the defendant's actions on October 29 and 30, 1979 since the events unfolded over a period of many hours, as well as at a later time at Father's Five, compare Neil v. Biggers, 409 U.S. 183, 93 S.Ct. 375 (1972) (whole incident only fifteen to thirty minutes duration);

(b) Linda Dixon's attention was more than adequately focused on the defendant because (1) on October 29 and 30, 1979, she was with him at different bars and was specifically waiting for him to return to his apartment with cocaine, and his appearance upon his late return was startling to her, and (2) some weeks later at Father's Five she was frightened by the defendant's words which were directed specifically to her;

(c) Linda Dixon's prior statements about the events she saw were highly consistent and contained a fair amount of detail concerning the length of time the defendant was absent, his appearance upon his return to the apartment, and his subsequent conversation with her at Father's Five;

(d) During hypnosis, Linda Dixon exhibited certainty about the principal facts of her account;

(e) Three months had passed from October 30, 1979, during the early hours of which Linda Dixon was in the defendant's

apartment, to February 1, 1980, the day she was hypnotized, compare **Neil v. Biggers, 409 U.S. 183, 93 S.Ct. 375 (1972)** (seven months between rape and showup);

(f) During hypnosis, Linda Dixon was not asked any leading or suggestive questions concerning, inter alia, the length of time the defendant was gone, his appearance upon his return, or the substance of the conversation with the defendant at Father's Five;

(g) Linda Dixon's testimony and demeanor established that "corrupting influences" of hypnosis, such as a superimposed memory of events and heightened subjective certainty, as argued by the defendant, were absent in her case.

## Conclusion

It is therefore the ruling of this court, based upon its findings of fact and analysis of the evidence presented, that:

(1) The rule of **Frye v. United States, 293 F. 1013** is not applicable to test the admissibility of hypnotically aided testimony.

(2) Linda Dixon is competent to testify as a witness since she has demonstrated sufficient ability to remember and recount events known to her personally from original memory independent of the hypnotic session, that no evidence was introduced to suggest that she had any motive to lie or otherwise distort her account of the events that she perceived, that she is currently able to discriminate those of her statements made before, during and after hypnosis, that her testimony and demeanor at the **voir dire** hearing clearly demonstrated that she did not substitute a "created" hypnotic recall for a recollection of events as she perceived them nor did she exhibit a greater sense of certainty than any other witness who is subject to the foibles of normal human recall.

(3) Under the totality of the circumstances, the hypnotic session of Linda Dixon on February 1, 1980 was not so impermissibly suggestive, nor did coercive conduct occur prior to or subsequent to the hypnotic session, as to create a substantial likelihood that her testimony would be tainted by an irreparably altered memory requiring a per se exclusion of her testimony from that of any other witness who is subjected to an alleged suggestive pre-trial procedure.

Accordingly, the defendant's motion to suppress the testimony of Linda Dixon is DENIED.

By the court,
Herbert Abrams
Justice of the Superior Court

---

[1] Defendant's Supplementary Memorandum of Law In Support of Motion To Suppress The Testimony of Linda Dixon.

[2] Incident Report #91-830577 (Exhibit #5) indicated that at approximately 7:20 A.M. on October 30, 1979, Boston police officers responded to a call at 285 Beacon Street, a four story brick dwelling undergoing renovation, that a woman's body was found on the second floor by employees of a contracting firm. The victim was subsequently identified as Susan Rose.

[3] Exhibit #4 is a typed report from notes taken by Detective Chaisson of the interview with Linda Dixon at 1:30 P.M. on February 1, 1980. The last two paragraphs pertain to information obtained as a result of the ensuing hypnotic session which commenced at 4:15 P.M. on the same date conducted by Detective Brady and attended by Detective Chaisson who testified that his typed report was prepared within 24 hours of his interview with Linda Dixon.

[4] Exhibit #7 is a 21-page transcript of the taped recording of the hypnotic session of Linda Dixon conducted by Detective Brady on February 1, 1980 at approximately 4:15 P.M. (See page #17 where the name "Dale" is mentioned).

[5] Bernard L. Diamond, *Interent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Cal. L. Rev. 313 (1980).

[6] Maintenance of critical judgment does not assure historical accuracy; rather, it assures that our confabulation of events – a gap filling memory process which happens all the time, with or without hypnosis – is plausible or reasonable sounding (Orne Tr. 149, 30-11).

[7] In *State v. Hurd*, 173 N.J. Super. 353, 362-363 (1980), the court adopted the following procedural safeguards derived from the testimony of Dr. Martin Orne:
   "(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis.
   "(2) The qualified professional conducting the hypnotic session should be independent of and not responsible to the prosecutor, investigator or the defense.
   "(3) Any information given to the hypnotist by law enforcement personnel prior to the hypnotic session must be in written form so that subsequently the extent of the information the subject received from the hypnotist may be determined.
   "(4) Before induction of hypnosis, the hypnotist should obtain from the subject a detailed desrip-

tion of the facts as the subject remembers them, carefully avoiding adding any new elements to the witness' description of the events.

"(5) All contacts between the hypnotist and the subject should be recorded so that a permanent record is available for comparison and study to establish that the witness has not received information or suggestion which might later be reported as having been first described by the subject during hypnosis. Videotape should be employed if possible, but should not be mandatory.

"(6) Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and post-hypnotic interview."

[8] Although the Supreme Judicial Court has not yet found occasion to adopt the Biggers-Brathwaite reliability test, see Commonwealth v. Venios, Mass. Adv. Sh. (1979) 1184, 1188-90, 389 N.E.2d 395, 397, it has described as "sound" the Appeals Court's discussion of the test in Commonwealth v. Cincotta, Mass. App. Ct. Adv. Sh. (1979) 73, 384 N.E.2d 1244, affirmed, Mass. Adv. Sh. (1979) 2671, 2677, 398 N.E.2d 478, 482.

[9] The court notes that such a conclusion may render moot any decision concerning the applicability of the Frye test to hypnosis.